COMMONWEALTH *vs.* DENNIS MAHAR.

Middlesex.   November 15, 1985. — December 24, 1985.

Present: GREANEY, C.J., DREBEN, & KAPLAN, JJ.

*Rape. Assault with Intent to Rape. Practice, Criminal,* Severance,
   Assistance of counsel. *Constitutional Law,* Assistance of counsel.

At the trial of an indictment for assault with intent to rape, evidence of the
   circumstances of the defendant's attack on the victim and the lack of
   any other motive were sufficient to establish that the defendant intended
   to rape the victim when he attacked her. [313-315]
A judge was not required to sever for trial two sets of indictments arising
   out of alleged sexual attacks by the defendant on two different women
   where, in the circumstances, a tactical decision by the defendant's trial
   counsel not to move for severance could not be considered manifestly
   unreasonable; where the judge could have concluded, as matter of sound
   discretion, that the two incidents were close enough in time and location
   and sufficiently similar in nature as to make their joinder for trial proper;
   and where, at a separate trial of indictments arising out of either incident,
   evidence of the other incident would have been admissible to show that
   the defendant was acting pursuant to a common scheme, to prove his
   intent, or to identify him. [316-318]
At a criminal trial an error by defense counsel during closing argument in
   misstating a time in connection with the defendant's alibis provided no
   basis for reversing his convictions on the ground that he had been denied
   effective assistance of counsel, where the circumstances of the trial
   tended to minimize the effect of the misstatement. [318-320]

INDICTMENTS found and returned in the Superior Court De-
partment, one on December 20, 1983, and two on December
27, 1983.

The cases were tried before *Robert A. Barton,* J.

*Kenneth Quat* for the defendant.

*J. W. Carney, Jr.,* Assistant District Attorney, for the Com-
monwealth.

GREANEY, C.J.  About 5:15 P.M. on November 16, 1983,
a woman (victim A) was attacked and raped on Westford Street

in Lowell. At about the same time the following evening, a second woman (victim B) was attacked in approximately the same location. The defendant was accused in various indictments of both assaults.[1] Following a single trial of all the indictments before a jury in the Superior Court, the defendant was convicted of rape (unaggravated) of victim A and of the assault with intent to rape and assault by means of a dangerous weapon of victim B.[2] Consecutive terms of imprisonment were imposed.[3] Represented by new counsel on appeal, the defendant argues: (1) that his motion for a required finding of not guilty should have been allowed with respect to so much of the indictment as charged him with an intent to rape victim B; (2) that there was prejudicial joinder of all the charges for a single trial; and (3) that, in final argument, his trial counsel provided him with ineffective assistance. We affirm.

We first summarize the evidence in the Commonwealth's case as to each incident as well as the evidence presented for the defense.

*The victim A incident.* Victim A testified that on November 16, 1983, she left work in Lowell at 5:00 P.M. and boarded a bus. At approximately 5:15 P.M., she got off the bus and began walking towards her apartment on Westford Street. A man, whom she later identified as the defendant, approached her from the rear and said hello. As she returned the greeting, she had a full face view of the man, who then asked whether she was "busy the next night." She replied that she was. The man also told her that he lived in the area. The victim continued

---

[1] The incident involving victim A led to indictments charging the defendant with aggravated rape and assault and battery. The incident with victim B led to indictments charging the defendant with assault with intent to rape, assault and battery by means of a dangerous weapon, and assault and battery.

[2] At the conclusion of all the evidence, the judge allowed the defendant's motion for a required finding of not guilty on so much of the indictment charging rape of victim A as alleged "aggravation". After the jury's return of guilty verdicts on all the charges before them, the judge dismissed the indictments which charged assault and battery on each victim on the basis that they constituted lesser-included offenses of the more serious crimes.

[3] For the rape of victim A, the defendant was sentenced to twelve to twenty years at MCI, Walpole; for the assaults on victim B, he was sentenced to eight to ten years to be served on and after the victim A sentence.

on her way, leaving the man about six feet behind. As she approached the vicinity of 377 Westford Street, the man pulled her left arm back and covered her mouth. He then pushed the victim into a yard and to the ground, where he pulled off her pants and her underwear. The victim began to scream. He again covered her mouth and inserted his penis into her vagina. During the rape, which lasted approximately five minutes, the victim observed the man's eyes to be "spacey" or "drugged." The assailant struck her three times in the area of her eyes and lips. The victim became "very scared" when her assailant warned her, "next time don't scream or I'll kill you." As the episode ended, the man kissed her and asked if she could see his face. After she told him she could not, he got up and ran away. The victim hurried to her apartment and told a neighbor that she had been raped. The police were called, and the victim was taken to the hospital. The victim also testified that her attacker was wearing a khaki green slicker or rain jacket. She identified a slicker seized from the defendant's automobile as similar to the one worn by her assailant.

The next day, Inspector Edward F. Davis of the Lowell police brought 100 photographs to victim A for examination. She selected the defendant's photograph from the group, stating that she was "99 percent sure" that the photo depicted her assailant. On December 15, 1983, the victim was taken to the Lowell District Court to view seven individuals in a lineup. She testified that she had picked the defendant out of the lineup as her assailant, and that she was certain at that point of her identification.

On cross-examination, the defendant's trial counsel elicited that the victim was unsure whether the man who attacked her wore a mustache. Defense counsel attempted, unsuccessfully, to get the victim to testify that the defendant's eyes were not brown, as she had testified, but hazel. An admission was also obtained from the victim that she had identified the defendant as "number six" in the photograph taken of the lineup, but had identified man "number five" in the photograph as her assailant in her testimony before the grand jury.

*The victim B incident.* Victim B testified that on November 17, 1983, at about 5:00 P.M., she left work at a bank in downtown Lowell and boarded a bus for the Cupples Square area to the corner of Loring and Westford Streets, where she lived. She got off the bus at approximately 5:20 P.M. While walking down Loring Street, she was approached by a man, whom she later identified as the defendant. Stopping her by planting his foot on the left side of her foot, he asked her for a match. At this point, the victim had a direct view of the upper part of the man's face, his hair, his eyes and his nose. The victim replied that she did not have a match and continued walking. The man then grabbed her left arm and bent it behind her back. The victim screamed and tried to move away, but the man forced her to the ground, grabbed her hair and pushed her face down. He then straddled her, as she described it, with "one leg on each side of me with his left knee slightly bent to keep me from trying to get up." When the victim continued screaming, the man told her to stop and that he had a knife, which was drawn. As he held her by the hair, he stabbed her in the back of the neck. The first thrust with the knife pierced the victim's jacket; a second thrust drew blood as the knife struck the victim's neck.

The victim screamed again when she felt the knife and started struggling to get out of the man's hold. She swung her left shoulder around, and her purse struck her assailant in the shoulder. This movement threw him slightly off balance as the victim rolled onto her back. She then kicked the man in his legs and his "privates." As he "grunted and leaned forward," the victim "scooted under his legs and ran."

The victim further testified that the man's eyes were "very glassy," that he had a "very light mustache," and that he was wearing a khaki colored green army jacket. After the incident, she was shown approximately 480 photographs by the police, but was unable to make an identification.[4] Shortly thereafter, she met with Inspector Davis, who showed her fifty additional

---

[4] There was no evidence that indicated that the defendant's photograph had been among the pictures examined by the victim.

photographs. From this second display, she selected the defendant's photograph as the photograph of her assailant. On the next day, November 18, 1983, she was taken to the Lowell District Court and asked to look at the men in the "arresting box" to see if she could identify her assailant. "Nervous and frightened," she was unable to make an identification. On December 23, 1983, she returned to the Lowell District Court to view a lineup. From a lineup of six men, she picked out the defendant as her assailant.

On cross-examination, the defendant's trial counsel established that the color of the defendant's eyes was hazel, and not brown, as the victim had originally reported. He also brought out that the victim had thought that the assailant's hair had looked bushier on one side than the defendant's hair appeared to be in the photograph she selected. The victim was also questioned by defense counsel about a photograph of the defendant printed in a local newspaper on November 21, 1983. She denied basing her initial identification of the defendant upon that photograph. She admitted, however, that the lineup identification had occurred after the photo appeared in the newspaper.

*Testimony about the police investigation.* Inspector Edward F. Davis of the Lowell police department testified that on November 17, 1983, he began an investigation of both assaults by obtaining a composite drawing of the attacker from victim B. Armed with the drawing and other information about the man's appearance given by both victims, he went to the Cupples Square area of Lowell where the assaults had occurred. While Davis was meeting with the two police officers who patrolled in that area, he observed the defendant approximately twenty-five feet from the location where victim B had been assaulted earlier that evening, and approximately 100 yards from the point where victim A had been raped the evening before.

Inspector Davis testified that, when first observed, the defendant was wearing dungarees and a red, hooded sweatshirt. These articles of clothing were seized.[5] At about midnight on

---

[5] Evidence that the defendant was arrested by Davis at this time for possession of marijuana was kept from the jury's attention by the judge.

November 17, Inspector Davis found the defendant's automobile and seized from it a khaki green rain slicker, a green Army field jacket and liner, and a military knife in a buttoned sheath. These items were introduced in evidence. Inspector Davis' testimony also recounted the victims' identifications of the defendant from the photographic displays and their later identifications from the lineups.

Cross-examination of Davis by the defendant's trial counsel brought out discrepancies in the victims' descriptions and identifications.

*The defense.* The defendant, a sergeant in the United States Army, testified on his own behalf. He noted that his eyes are hazel-colored, not brown, as victim A had testified, and that on November 16, he had a mustache. As to the incident involving victim A, he offered an alibi. He stated that on that date he had attended a meeting from 4:30 to 5:15 P.M. at Fort Devens, where he was stationed. After the meeting, he left for his home in Lowell, arriving at approximately 5:30 P.M. He then left his home at approximately 6:00 P.M. to go to a local tavern, where he remained until midnight. His testimony was corroborated, in part, by two sergeants at Fort Devens. Both testified that the defendant had been with them in a meeting at the base until 5:15 P.M. One of the soldiers also indicated that the khaki rain slicker found in the defendant's automobile was regular Army issue clothing of a type commonly worn by military personnel at Fort Devens.

As to the November 17 incident involving victim B, the defendant gave additional alibi testimony. He had arrived home at about 3:30 P.M. and left home at about 6:15 or 6:30 P.M. He was driven by his brother, Donat, to a liquor store and then on to a friend's house at 377 Westford Street. The defendant confirmed that the Cupples Square area was about one mile from his home (roughly a five-minute drive).

Later on the evening of November 17, the defendant left his friend's house and was picked up by his brother and driven to a Sears and Roebuck store, where, according to his testimony, he looked at tools for five or ten minutes. His brother then gave him a ride to a liquor store. After purchasing some

beer, he had begun walking back to his friend's house when he encountered the police.

The defendant's stepbrother, William F. Moran, testified in corroboration of the alibis. He stated that, on November 16, the defendant had arrived home about 5:30 or 5:35 P.M. and that the defendant had stayed at home until about 6:00 P.M., when he left the house with a friend. The stepbrother further testified that when he arrived home on November 17 at 5:10 P.M., the defendant was there and that the defendant did not leave the house that night until shortly after 6:00 P.M.[6]

1. We first take up the defendant's contention that his motion for a required finding of not guilty, Mass.R.Crim.P. 25(a), 378 Mass. 896 (1979), should have been allowed with respect to so much of the indictment as charged him with an intent to rape victim B.[7]

"The essential question in evaluating the denial of a motion for a required finding of not guilty is whether the evidence received, viewed in a light most favorable to the Commonwealth, is sufficient so that the jury 'might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt.' *Commonwealth* v. *Vellucci,* 284 Mass. 443, 445 (1933)." *Commonwealth* v. *Clary,* 388 Mass. 583, 588-589 (1983). See *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-678 (1979); *Commonwealth* v. *Amado,* 387 Mass. 179, 186 (1982).

We think the Commonwealth's evidence was sufficient to establish that the defendant intended to rape victim B when he assaulted her. In the absence of direct evidence on the issue, criminal intent can be inferred from the circumstances of the

___

[6] We omit a summary of the Commonwealth's rebuttal evidence, noting only that the evidence tended to undermine the defendant's alibi.

[7] The defendant actually argues that his rule 25(a) motion should have been allowed as to the entire indictment, but it is clear that the evidence in the Commonwealth's case was more than sufficient to establish that the defendant had assaulted victim B.

crime. *Commonwealth* v. *Correia,* 381 Mass. 65, 83 (1980).
The circumstances of the attack on victim B disclose several
features which have appeared in decisions upholding a convic-
tion for assault with intent to rape. For example, a brief, casual
conversation between assailant and victim has often preceded
the incident. See *Commonwealth* v. *Derby,* 263 Mass. 39,
43-44 (1928); *Commonwealth* v. *Corcoran,* 332 Mass. 615,
616 (1955); *Commonwealth* v. *Freeman,* 352 Mass. 556, 557-
558 (1967). A struggle usually occurs as the assailant attempts
to subdue the woman and she kicks or screams in an effort to
ward him off. See *Commonwealth* v. *Thompson,* 116 Mass.
346, 346-347 (1874); *Commonwealth* v. *Derby, supra; Com-
monwealth* v. *Corcoran,* supra; *Commonwealth* v. *Mattson,*
377 Mass. 638, 642 (1979); *Commonwealth* v. *Rossi,* 19 Mass.
App. Ct. 257, 258 (1985). The defendant often does not make
a direct statement of his intent to commit rape. See. *Common-
wealth* v. *Thompson, supra; Commonwealth* v. *Derby, supra;
Commonwealth* v. *Corcoran, supra; Commonwealth* v. *Nicker-
son,* 388 Mass. 246, 247 (1983). Nor is it uncommon to see
that the assailant does not have an opportunity to disrobe the
woman before the assault is thwarted. See *Commonwealth* v.
*Thompson, supra; Commonwealth* v. *Derby, supra; Common-
wealth* v. *Corcoran, supra.*

Also of importance in this case is the absence of any other
motive on the defendant's part; a fact which could have led
the jury to conclude that he harbored an intent to rape victim
B. There was, for example, no grudge that existed between
the defendant and victim B or any of her acquaintances. Cf.
*Commonwealth* v. *Pendergrast,* 385 Mass. 625, 635-638
(1982). Nor did the incident represent an irrational attack by
a person suffering from a major mental illness. There is also
an absence of evidence showing an intent to commit larceny.
The defendant never attempted to steal victim B's purse, even
when he was struck by it, and a larcenous intent is inconsistent
with the defendant's having thrown victim B to the ground.
Cf. *Commonwealth* v. *Rossi, supra* at 261; *Commonwealth* v.
*Nickerson, supra* at 252 (an inference of an intent to commit
rape was supported by the fact that "the victim's purse was

not taken"). While the defendant had victim B on the ground, he told her to stop screaming and that he had a knife, remarks that the jury could have found aimed at affording the defendant an uninterrupted opportunity to rape, an inference considerably strengthened by the fact that the defendant was straddling the victim holding her in a vulnerable position. Cf. *Commonwealth v. White*, 11 Mass. App. Ct. 929, 930 (1981).

We find the case, on the whole close to the circumstances in the *Derby* case where a conviction for assault with intent to commit rape was upheld. In *Derby*, the defendant approached a woman and, after commenting on the weather, lunged at her and threw her to the ground. He rejected an offer of her purse and held her until her cries attracted the attention of her neighbors, whereupon he ran off. The Supreme Judicial Court noted (263 Mass. at 44) that:

> "While the stockings of the prosecutrix were somewhat torn at the knee because of her contact with the ground, there was no evidence that her clothing had been displaced or disarranged. It is plain there was evidence of an assault, and the criminal intent of the defendant was for the jury to determine in view of all the circumstances. [Citation omitted.] We cannot say as a matter of law that the evidence was so slight that it was the duty of the court to direct a verdict of not guilty."

See also *Commonwealth v. Corcoran*, 332 Mass. 615 (1939). On all the evidence in the Commonwealth's case, the issue whether the defendant had an intent to rape was for the jury.[8]

---

[8] The defendant renewed his motion for a required finding of not guilty on the charge at the close of all the evidence. The Commonwealth's case did not deteriorate between the time the motion for required finding was first denied and the close of all the evidence. The renewed motion was properly denied.

In reaching our conclusion, we have not taken into account the Commonwealth's evidence in the case of victim A. We conclude, in part 2 of this opinion, that no prejudicial joinder of charges has been shown. We do not imply that the Commonwealth's evidence in the case of victim A could not have been considered by the jury in weighing the sufficiency of the proof of the defendant's intent at the time of his assault on victim B. "In general,

2. The defendant next contends that trying the two sets of indictments together was not in the best interests of justice and that, accordingly, the cases should have been severed for trial. We reject the contention.

The threshold problem with the defendant's position is the failure of his trial counsel to file a motion to sever prior to the trial. Rule 9(d) (2) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 860 (1979), requires that a motion to sever "shall be in writing and made before trial and shall be supported by an affidavit setting forth the grounds upon which any alleged prejudice rests, except that a motion for severance may be made before or at the close of all the evidence if based upon a ground not previously known." There is no showing that the basis for possible severance was not known to the defendant's trial counsel before trial. See *Commonwealth* v. *Ellis,* 12 Mass. App. Ct. 612, 621 (1981). Nor does there appear to have been any unexpected evidence submitted in the course of the trial that either gave rise to prejudice or triggered a possible obligation on the judge's part to consider severance sua sponte. *Ibid.* The defendant's trial counsel filed motions to suppress, to sequester witnesses, and for required findings of not guilty. This conduct suggests attentiveness to the defendant's rights and perhaps a perception that a joint trial was not to the defendant's disadvantage. The latter view could fall within the area of a trial strategy designed on the thought that the case would rise or fall on the prosecution's ability to overcome the weaknesses in the victims' identifications and the defendant's claims of alibi. This strategy cannot be labelled manifestly unreasonable. A new trial is not required simply

---

evidence tending to show that a defendant committed crimes unrelated to the offense with which he is charged is competent where such evidence has a tendency to show a common scheme, a pattern of operation, absence of accident or mistake, identity, intent and motive." *Commonwealth* v. *Schoening,* 379 Mass. 234, 242 (1979), and cases cited. We merely hold that the Commonwealth's evidence in the case of victim B was, apart from the evidence in the case involving victim A, sufficient to send the charge of assault with intent to rape to the jury.

because it failed.[9] See *Commonwealth* v. *Rosadilla-Gonzalez,* 20 Mass. App. Ct. 407, 410-411 (1985).

Moreover, the question whether to sever, had it been raised, would have fallen within the sound discretion of the judge. See *Commonwealth* v. *Gallison,* 383 Mass. 659, 671 (1981); *Commonwealth* v. *Sylvester,* 388 Mass. 749, 754 (1983); *Commonwealth* v. *Todd,* 394 Mass. 791, 794 (1985). Under Mass.R.Crim.P. 9(a) (1) (3), 378 Mass. 859 (1979), joinder is proper if two or more offenses "arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." The evidence in these cases could permissibly be found to indicate a common plan by the defendant.[10] It could also have been found that the two separate incidents were close enough in time and space, and of the same general nature, so as to make their joinder for trial proper.[11] Joinder in such circumstances has been upheld in many cases. See *Commonwealth* v. *Pope,* 392

---

[9] The alibi assertions had some force, being supported, as to the first incident, by two military men who put the defendant at a meeting at Fort Devens at the important time, and as to both incidents, by the testimony of the defendant's stepbrother.

The identifications of the victims were also called into question by their failure to notice the hazel color of his eyes, their various observations of a mustache, misidentification by victim A of the defendant's number in the photograph of the lineup, the inability of victim B to make an initial identification, and the suggestion that victim B's identification of the defendant was prompted by a picture in a local newspaper.

[10] The Commonwealth's evidence at trial showed that the defendant was engaged in a pair of violent sexual assaults upon young women in the Cupples Square area of Lowell. On two consecutive days, at approximately the same time, he stalked his victims after they got off a bus near Westford Street. As each woman walked to her home, the defendant engaged her in a casual conversation, and then grabbed each from behind. Thrust to the ground, the victim screamed and a struggle ensued as the defendant straddled her. One woman was raped; the other escaped after her thrashing legs caught him in the genitals. The attacks on November 16 and November 17 occurred within 100 yards of each other.

[11] The fact that the attacks occurred on the separate days did not, under the circumstances, preclude joinder. See *Commonwealth* v. *Drew,* 4 Mass. App. Ct. 30, 33 (1976); *Commonwealth* v. *Doyle,* 5 Mass. App. Ct. 544, 547 (1977).

Mass. 493, 503 (1984) (indictments for rape, assault with intent to rape, and indecent assault and battery against four different victims properly joined for trial); *Commonwealth* v. *Drew,* 4 Mass. App. Ct. 30, 33 (1976); (armed robberies on consecutive days properly joined); *Commonwealth* v. *Sylvester,* 13 Mass. App. Ct. 360, 361-364 (1983), *S.C.,* 388 Mass. 749 (1983) (two indictments for rape held properly joined with three other indictments for lascivious acts, each with separate victims and dates); *Commonwealth* v. *Williams,* 18 Mass. App. Ct. 945 (1985) (no error in denying severance as to two burglaries at separate locations where one victim was raped and the other beaten unconscious).

Last, weighing heavily against the success of a motion for severance would have been the rule that at the trial of either incident the evidence of the other incident could have been admissible to show that the defendant was acting pursuant to a common scheme, plan or method, see *Commonwealth* v. *Gallison,* 383 Mass. at 672; *Commonwealth* v. *Williams, supra,* or to prove the defendant's intent, see *Commonwealth* v. *Kenneally,* 10 Mass. App. Ct. 162, 181 (1980), *S.C.,* 383 Mass. 269 (1981); *Commonwealth* v. *Fleury-Ehrhart,* 20 Mass. App. Ct. 429, 431 (1985), or to identify the defendant, see *Commonwealth* v. *Kines,* 5 Mass. App. Ct. 632, 635 (1977); *Commonwealth* v. *Madyun,* 17 Mass. App. Ct. 965, 966 (1983). These considerations lead us to conclude that a denial of a motion to sever, had one been filed, would have been upheld on appeal. This conclusion precludes the relief now sought by the defendant.

3. The defendant finally contends that his trial counsel provided him with ineffective assistance in his summation to the jury (1) by failing to engage in any argument regarding the merits of the defendant's case or the weaknesses in the prosecution's case, and (2) by misstating the defendant's stepbrother's alibi testimony as to a critical time on November 17.[12]

---

[12] The defendant's trial counsel told the jury that the defendant's stepbrother had testified that he was with the defendant on November 17, from 5:30 P.M. until 6:00 P.M., although the stepbrother had in fact testified that they had been together at home from 5:10 P.M. until 6:00 P.M. The misstatement could have led to a conclusion that the defendant had the opportunity to commit the assault on victim B and still get home by 5:30 P.M.

The ineffective assistance argument is made under the Sixth Amendment to the United States Constitution. The test on that ground involves the application of standards set forth in *Washington* v. *Strickland,* 466 U.S. 668, 687 (1984), as follows:

> "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."

The first contention (no final argument about misidentification and alibi) is belied by the record. The defendant's trial counsel argued to the jury all the deficiencies that had been brought out in the victims' identifications, and he reviewed the testimony given by the defendant and the alibi witnesses. The closing argument stressed the factors suggesting weaknesses in the Commonwealth's case and the strengths of the defendant's evidence. There is no basis, therefore, to compare this case to one in which defense counsel engaged only in a semblance of argument and abandoned the defense. See and compare *Commonwealth* v. *Westmoreland,* 388 Mass. 269 (1983); *Commonwealth* v. *Street,* 388 Mass. 281 (1983).

The second contention (counsel's assignment of a wrong time in connection with the alibi given by the defendant's stepbrother for November 17) involves an obvious misstatement by counsel. In our view, several factors ameliorated the possible effect of the misstatement. It involved only one piece of evidence and not the whole of the alibis. The jury was specifically instructed by the judge that if any reference by counsel "to matters of evidence does not coincide with your

own recollection of the evidence, it is your recollection which should prevail during your deliberations." That instruction had particular force because the jurors had been permitted to take notes during the testimony of the witnesses, but had been forbidden to take notes during the final arguments of counsel. The summation of defendant's trial counsel, as noted above, also adequately directed the jury to his key contentions. Finally, the defendant's trial counsel concluded his summation with several assertions of fact highly favorable to the defendant but lacking any basis in the evidence. These assertions included claims that the defendant had been in the Army for four years, that he had volunteered for military service, and that he had an impeccable service record.

Viewing the summation of defense counsel as a whole, and in the context of counsel's work during the entire trial, we conclude that the jury's verdicts were the product of a fair trial.[13] See generally *Commonwealth* v. *McGann,* 20 Mass. App. Ct. 59, 61-62 (1985).

*Judgments affirmed.*

---

[13] We would be of the same opinion upon an application of the State standard for judging ineffective assistance of counsel, see *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), and would conclude under that standard that counsel's representation was adequate and that nothing was done which would deprive the defendant of a defense.