### Judith A. Wells *vs.* Zoning Board of Appeals of Billerica & others.[1]

No. 06-P-537.

Middlesex. December 6, 2006. - April 24, 2007.

Present: Cypher, Smith, & Katzmann, JJ.

*Zoning,* Board of appeals: decision, By-law, Nonconforming use or structure. *Practice, Civil,* Standing.

The plaintiff in a civil action against a town's zoning board of appeals (board) had standing as an abutter of land on which a residence was being constructed to challenge the board's decision to grant a special permit for the construction of that residence. [731]

A Superior Court judge properly annulled a decision of a town zoning board of appeals (board) to issue a special permit to construct a residence, on the basis that such activity qualified as a "reconstruction" of a nonconforming structure that had been torn down more than two years before, and properly ordered removal of the residence, where the permit was unlawfully issued, given that only certain dwellings on lots 5,000 square feet or greater were exempt from the two-year limitation on reconstruction pursuant to the controlling zoning by-law, and where the previous nonconforming structure's lot area fell below that minimum requirement. [731-737]

Civil actions commenced in the Superior Court Department on December 1, 2000, and September 5, 2003, respectively.

After consolidation, the case was heard by *Thomas P. Billings,* J.

*James T. Dangora, Jr.,* for Edward P. Coneeny & another.

*Denise M. Tremblay (Philip C. Lombard, Jr.,* with her) for the plaintiff.

Cypher, J. Edward P. Coneeny and Kathleen M. Bavis, trustees of the Bear Hill Realty Trust (trust), appeal from a Superior Court judgment that ordered the removal of a residence

---

[1]Building inspector of Billerica, and Edward P. Coneeny and Kathleen M. Bavis, trustees of the Bear Hill Realty Trust.

Coneeny constructed on land owned by the trustees in Billerica. Because Coneeny is the principal actor in this case, we shall refer to him throughout. He claims that the judge erred in annulling a decision of the zoning board of appeals of Billerica (board), and in ordering the residence removed.

*Background.* The plaintiff, Judith A. Wells, surprised to see heavy equipment and a large excavation on an adjacent lot one day in August, 2000, and unaware that Coneeny had obtained a foundation permit on April 5, 2000, sought a cease and desist order from Billerica's building inspector. It was denied, and she appealed to the board. Subsequently, Coneeny was issued a building permit on September 7, 2000. Wells's request for a preliminary injunction was denied on September 25. The motion judge stated that "[Wells's] view has already been obstructed, and thus an injunction against further construction would not achieve her desired relief." The motion judge ended with a caution to the effect that if Wells ultimately prevailed in her action, the court had the authority to order the removal of the house, and that the "continued construction of the building . . . pending the outcome of this action, as well as the appeal to the [board], is being done at [Coneeny's] financial peril, and with fair notice that a court may ultimately order the . . . building removed from that location."

On an evenly split vote of 2-2, Wells's appeal of the building inspector's refusal to issue a cease and desist order was denied by the board on November 6, 2000, and the decision was filed with the town clerk on November 20, 2000. Pursuant to G. L. c. 40A, § 17, Wells then filed a verified complaint in the Superior Court on December 1, 2000, appealing from the board's decision and also seeking a preliminary injunction to stop further construction. Again her request for a preliminary injunction was denied, this time by another judge, on December 14, 2000. The judge stated that Wells had "failed to sustain her burden of demonstrating irreparable harm," because the house on Coneeny's property was "nearly finished."

Following a jury-waived trial of Wells's action on January 22 and 23, 2003, a third judge annulled the decision of the board. In a lengthy analysis (first decision), the judge found that the construction resulted in certain illegalities under Billerica's zon-

ing by-law (by-law) and G. L. c. 40A. Although the judge stated that the case had a "troubled history," he thought that an order of demolition was not then appropriate. He opined that because the board had not considered the construction in its current configuration or under a revised by-law, Coneeny should have an opportunity to apply to the board to determine whether the illegalities might be rectified by appropriate action of the board. Accordingly, he ordered a judgment annulling the November 6, 2000, decision of the board, but retained jurisdiction to reopen the case if further proceedings were appropriate.[2] The judgment further provided:

> "The owners of Parcels 28-2 and 28-4 [the "locus" upon which the building had been constructed] may, within thirty days after entry of judgment apply to the Board of Appeals for whatever permits, variances or other relief may be appropriate with respect to the structure thereon. The Board is to make its determinations without regard to any self-created hardship stemming from the builder's election to continue construction after he was on notice . . . that continued construction was at his financial peril."

Coneeny thereupon petitioned the board for a height variance and a special permit for a nonconforming building. In its decision on August 6, 2003, the board, concluding that no variance was required, granted a special permit principally on the ground that construction of the house qualified as a reconstruction, and that it "was not more detrimental to the neighborhood." The board unanimously stated that the "dwelling shall remain."

On September 5, 2003, Wells filed a verified complaint in the Superior Court pursuant to G. L. c. 40A, § 17. She challenged the issuance of the special permit and alleged several factors of nuisance related to occupancy of the house, as well as water runoff impacting her property, caused by further work performed on the locus. This action was consolidated with her prior action and additional evidence was taken by the judge.

---

[2]Coneeny filed a notice of appeal on April 25, 2003, and the appeal was entered in this court on June 19, 2003. Subsequently, this court ordered the entry of that case vacated as premature because it appeared that there were deficiencies in the transcript of the proceedings in the Superior Court.

In his decision after remand (second decision), the trial judge annulled the August 6, 2003, decision of the board. In a judgment entered on June 2, 2005, the judge declared that the building permit was unlawfully issued, and ordered that the house and foundation be removed and that the site be restored to its undeveloped state.[3] Coneeny's appeal followed.[4]

*The locus.* The history of the land on which Coneeny constructed the house at issue is essential to an understanding of this case. We summarize the judge's findings. Throughout the relevant times until the trial, the locus consisted of two adjoining parcels that had been known by assessors' numbers as parcel 28-2 (2,733 square feet) and parcel 28-4 (3,627 square feet). At some time prior to the adoption of Billerica's first zoning by-law in 1945, each parcel had been formed by merging two smaller lots from among those created in a development known as Nuttings Lake Park, circa 1910. The two parcels had different owners and did not come into common ownership until 1978 under William B. Callison.[5]

In 1995, Callison sold parcel 28-4 to Coneeny's daughter, Angela M. Culot, but retained ownership of parcel 28-2.[6] In 1998, parcel 28-2 was conveyed to Coneeny by Callison's executors. Coneeny later conveyed it to the trust. In 2000, when

---

[3]Wells sought a postjudgment injunction on June 28, 2005. After a hearing, a fourth judge ordered that Coneeny be restrained from (1) leasing or allowing the premises to be occupied; (2) conducting any construction or earth moving (except for maintenance or repairs); or (3) dumping debris or trash unless and until the house was demolished in accordance with the court's order or there was other final disposition of the case.

[4]Wells filed a notice of appeal on June 28, 2005. In our record, but not appearing in the docket, is a stipulation of dismissal of Wells's cross appeal by Wells, Coneeny, the building inspector, and the board.

The board filed both an appeal from the final judgment and a notice in this court that it adopted Coneeny's brief; it filed neither a separate brief nor a separate docketing fee. Wells's subsequent motion to preclude oral argument by the board was allowed by the panel. The board then moved to file the docketing fee late and offered a statement of issues on appeal. That motion was denied by the panel and the docketing fee was returned.

[5]In 1978, Callison also owned the adjacent parcel 28-5.

[6]Also in 1995, Callison conveyed parcel 28-5 to Coneeny, who constructed a residence on that parcel. Wells later purchased the property, and has resided there during the relevant times in this case. The judge described this parcel as "nonconforming, purportedly grandfathered."

the building permit issued, parcel 28-2 was owned by the trust and parcel 28-4 was owned by Coneeny's daughter. The house at issue was constructed straddling the lot line between parcels 28-2 and 28-4. Parcel 28-4 was conveyed to the trust by Culot in January, 2003, some five days before the trial.

While parcel 28-4 remained unimproved until 2000, parcel 28-2 had contained a "rustic" structure variously described as a "cottage," "shack," "camp," "house," or "dwelling," of some 556 square feet, constructed on piers rather than a foundation, and without heat or running water; it apparently was used seasonally. Its deteriorated condition made it prey to vandalism, and after a wall was pushed out and the roof collapsed, it was removed by Callison in 1979. Parcel 28-2 thereafter remained vacant until 2000.

The judge noted that several attempts had been made by owners of parcels 28-2 and 28-4, including Coneeny, to combine the two parcels into a single lot that could be built upon. In 1995, on a 3-2 vote, the board denied a variance sought for that purpose. The decision was appealed to the Superior Court, and while that case was pending, the owners in 1998 were denied a favorable decision by the building inspector on their contention that the parcels were grandfathered; the board upheld the inspector's decision on a 5-0 vote. That decision also was appealed to the Superior Court, and the two cases were consolidated. In April, 1999, summary judgment was entered against the owners. The motion judge relied on Billerica's zoning by-law and G. L. c. 40A, § 6, fourth par., to rule that the two undersized parcels could not be combined to create a lot that would satisfy the requirement of § 6, fourth par., that a grandfathered lot have at least 5,000 square feet of area, thus exempting the land from the current requirements of the zoning by-law (then 30,000 square feet). The owners appealed, but while the appeal was pending, an "understanding" was reached with the board[7] that the parcels could be combined and that a "reconstruction" of the former cottage would be permitted. Following the issuance of a foundation permit by the building inspector, the two consolidated cases were voluntarily dismissed and the appeal was not pursued further.

[7]The judge stated that "[t]he understanding evidently followed a meeting between town counsel and the [board] on March 2, 2000."

*Discussion.* a. *Standing.* We need not consider at any length Coneeny's assertion that the judge erroneously concluded Wells had standing. Wells was a person aggrieved when she contested the actions of the building inspector. Compare *Elio* v. *Zoning Bd. of Appeals of Barnstable,* 55 Mass. App. Ct. 424, 426-428 (2002). Abutters enjoy a presumption of aggrieved person status, and "may challenge a decision of a zoning board of appeals." *Marashlian* v. *Zoning Bd. of Appeals of Newburyport,* 421 Mass. 719, 721 (1996), and cases cited. It does not appear that Coneeny produced evidence to rebut Wells's grievance claims. A trial judge's findings of aggrieved person status will not be reversed unless clearly erroneous. *Paulding* v. *Bruins,* 18 Mass. App. Ct. 707, 709 (1984). The judge properly denied Coneeny's motion for dismissal or directed verdict. Coneeny has not demonstrated that the judge's findings are clearly erroneous.

b. *Standard of review.* A decision of a zoning board of appeals "cannot be disturbed unless it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." *MacGibbon* v. *Board of Appeals of Duxbury,* 356 Mass. 635, 639 (1970). The decision must not be based on a "standard, criterion, or consideration not permitted by the applicable statutes or by-laws." *Britton* v. *Zoning Bd. of Appeals of Gloucester,* 59 Mass. App. Ct. 68, 73 (2003), and cases cited. Because in the present case no transcripts have been made available, and the parties do not dispute the material facts, our review is confined to a determination whether the board correctly applied relevant statutes and zoning by-laws.

c. *Legality of construction of the house*[8] *on the locus.* At the time the building inspector issued the building permit in 2000, § 11.B of the by-law provided, "If any lawfully non-conforming building or use . . . be at any time discontinued for a period of two (2) years or more . . . it shall thereafter conform." Since the structure on parcel 28-2 had been torn down in 1979 by

---

[8]We summarize the judge's findings on the house: It was constructed on a concrete foundation with a basement, first and second floors, and a half-story attic. The footprint is twenty-three by thirty-four feet. There is an attached garage. The house and Wells's house are located on parcels which are divided by a common rear lot line. Before Coneeny later brought in additional fill, the basement was almost entirely above grade and the height of the entire structure was 30.7 feet above mean grade.

Callison, the opportunity to rebuild had expired in 1981. The trial judge therefore correctly determined in his first decision that the building inspector's approval of the reconstruction "ran afoul" of the by-law as well as G. L. c. 40A, § 6, third par. The trial judge also found that the construction resulted in a nonconformity in a yard setback[9],[10] and violated the restriction on building height.[11]

In 2001 (after the building permit had issued, but before the January, 2003, trial), the by-law was amended to exempt certain dwellings from the two-year limitation on reconstruction of prior nonconforming buildings. As amended, § 10.E of the 2001 by-law, governing "abandonment, discontinuance, and non-use," provides:

> "1. Any pre-existing, non-conforming building, structure, or use that is abandoned, discontinued, or not used for a period of two or more years shall comply with all provisions of this Zoning By-law. *This provision shall not apply to single or two family dwellings on lots 5,000 square feet or greater.* Any abandoned, discontinued, or not used single or two family dwelling shall comply with the provisions of section C, set forth above." (Emphasis supplied.)

Notwithstanding the clear violation of the by-law as in effect when the building permit issued in 2000, the trial judge, in an abundance of caution, and in light of the 2001 by-law amendment, refrained in his first decision from ordering demolition of the house, in case it "might be . . . rebuilt, after compliance with proper procedures, under [the] new bylaw, and assuming favorable action by the [b]oard." The judge opined that "[i]f an

---

[9]A new nonconformity was created on the side affecting Wells's property, because the house was set back 12.5 feet, while the requirement in the 2000 by-law was fifteen feet.

[10]At the time the building inspector issued the building permit, parcels 28-2 and 28-4 had not been merged, and the judge observed that a "more glaring" nonconformity resulted because the house "actually straddles the lot line between Parcels 28-2 and 28-4," and, therefore, the two parcels were not, in 2000, "[a]n area of land in one ownership" — thereby falling outside the definition of a lot in the 2000 by-law.

[11]Because the basement was almost entirely above grade, it qualified as a "story" under § 2.48 of the by-law, resulting in a violation of the two and one-half story restriction in § 8.1. See note 8, *supra*.

illegality might, in theory, be rectified with a variance, permit, or other action by the local authorities, the owner ought to be given a reasonable opportunity to apply." Accordingly, the judge decided to remand the case to the board. In its decision after remand the board granted Coneeny a special permit, finding, pursuant to § 10.C.3 of the 2001 amended by-law, that the house was "not substantially more detrimental to the neighborhood than the pre-existing, nonconforming dwelling."[12],[13] The board further found that, pursuant to § 10.E.1 of the 2001 by-law, "the abandonment issue does not apply, since this dwelling is on a lot greater than 5000 [square feet]." We turn then, to an examination of § 10.E.1 of the 2001 by-law.[14] See *Britton* v.

---

[12]The board further found "that the Building Inspector acted on good faith and within his discretionary interpretation of the Zoning By Law relative to the facts before him in this case," and that "each and every case must be evaluated on its own merits." The board stated that it had relied, inter alia, on the following factors in making its determination:

> "a. Presently both lots have been merged by deed recorded at the Middlesex North Registry of Deeds, thus creating 1 lot of approximately 6200 [square feet].

> "b. A letter from the Director of Planning dated 6/2/03 . . . refers to the creation of new lots and states in part 'for subdivision control purposes a new lot is not created unless new lines are drawn,' and 'the combining of existing lots does not constitute the creation of a new lot under the Planning Board's Subdivision Control jurisdiction.' "

[13]The trial judge noted that the permit approval "was issued against the backdrop, and effectively as a settlement, of disputes between Coneeny and the Town over the former's prior attempts to develop the two lots. Those disputes had reached this Court in two separate cases . . . where they were largely resolved against Coneeny, leaving only (1) his appeal on the zoning issues and (2) resolution of his constructive taking claims, on which this Court has never ruled."

The judge further noted that in both Wells's 2000 and 2003 cases, Coneeny cross-claimed against the town, asserting a claim of inverse condemnation in the event that construction of the house was not permitted under the zoning by-law. The judge stated that by agreement of the parties and an order of the court, that claim was severed and stayed pending the resolution of the zoning issues in the consolidated cases.

[14]The trial judge appears to have assumed that the 2001 by-law amendment would apply retroactively to include buildings, as here, not in existence when the by-law amendment took effect or, indeed, for many years previously. In his second decision the judge stated, "Abandonment is no longer, since the 2001 amendment, an obstacle to the subject project." As no party has argued

*Zoning Bd. of Appeals of Gloucester*, 59 Mass. App. Ct. at 73 ("[i]n the main . . . the court determines the content and meaning of statutes and by-laws").

The critical language in § 10.E.1 provides that the two-year limit on reconstruction of prior nonconforming buildings "shall not apply to single or two family dwellings on lots 5,000 square feet or greater." Assuming without deciding that the earlier structure was a "dwelling,"[15] we must then determine whether it was on a lot of 5,000 square feet or greater.[16]

Before 1978, parcel 28-2, with an area of 2,733 square feet, was held in separate ownership, and thus would not come within § 10.E.1's exemption of dwellings "on lots 5,000 square feet or greater." In 1978, Callison, who already owned the adjacent parcels 28-4 and 28-5, having purchased them in 1970, came to own parcel 28-2. Together the square footage of the three lots combined amounted to some 12,000 square feet. The prior structure was still standing at that time, not having been torn down until 1979. Thus, in 1978, applying the 2001 by-law amendment retroactively, the structure stood on a combined lot (for zoning purposes; see discussion, *infra*) of some 12,000 square feet, and came within § 10.E.1's exemption of dwellings "on lots 5,000 square feet or greater." In 1995, however, Callison sold off parcel 28-4 (to Coneeny's daughter) and parcel 28-5 (to Coneeny), keeping parcel 28-2 for himself, which, by itself, thus once again fell below the 5,000 square foot minimum. Notwithstanding the fact that the minimum lot size required for a dwelling in the "Village Residential" district was then 30,000 square feet, Coneeny proceeded to build on parcel 28-5, which

---

otherwise, we do not address the issue, but assume, without deciding, that the amendment applies retroactively. But see *Sentry Fed. Sav. Bank* v. *Co-operative Central Bank*, 406 Mass. 412, 414 (1990) ("[u]nless the legislative intent is unequivocally clear to the contrary, a statute operates prospectively, not retroactively").

[15]Citing *Fitzsimonds* v. *Board of Appeals of Chatham*, 21 Mass. App. Ct. 53, 56-57 (1985), and *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. 349, 356 & n.11 (2001), the trial judge deferred to the board's finding that the prior structure was a dwelling.

[16]Since lot size is an integral part of the provisions of § 10.E.1 as to abandonment of prior nonconforming dwellings, we do not confine ourselves to consideration of the factors in G. L. c. 40A, § 6, first par. Compare *Willard* v. *Board of Appeals of Orleans*, 25 Mass. App. Ct. 15 (1987); *Dial Away Co.* v. *Zoning Bd. of Appeals of Auburn*, 41 Mass. App. Ct. 165 (1996).

contained some 6,000 square feet, and sold the dwelling to Wells, where she continues to reside. Coneeny subsequently constructed the dwelling at issue so that it straddled the lot line between parcels 28-2 and 28-4; he then purchased parcel 28-4 from his daughter in 2003 and recorded a deed formally merging parcels 28-2 and 28-4, together covering an area of some 6,000 square feet.

The difficulty for Coneeny arose in 1995, when Callison re-divided what was already a single, undersized lot for zoning purposes (parcels 28-2, 28-4, and 28-5 combined, totaling some 12,000 square feet) by selling off parcels 28-4 and 28-5. Notwithstanding the fact that the basis of the board's decision that "the dwelling shall remain" is grounded in the building's purported legitimacy as a reconstruction of a prior nonconform-ing single family dwelling, only dwellings "on lots 5,000 square feet or greater" may be reconstructed after two years pursuant to § 10.E.1 of the 2001 by-law. Moreover, even for nonconforming structures, a by-law's provisions as to minimum lot size still ap-ply, "so far as met." *Alley* v. *Building Inspector of Danvers*, 354 Mass. 6, 7 (1968).

The use of parcels 28-2, 28-4, and 28-5, which, in 1978, were all owned by Callison, is therefore governed by "the general principle that adjacent lots in common ownership will normally be treated as a single lot for zoning purposes so as to minimize nonconformities with the dimensional requirements of the zoning by-law." *Seltzer* v. *Board of Appeals of Orleans*, 24 Mass. App. Ct. 521, 522 (1987), and cases cited.

By the time Callison owned parcels 28-2, 28-4, and 28-5, the minimum lot size required in the by-law was 30,000 square feet; the three lots together, comprising some 12,000 square feet, thus equaled less than half the minimum lot size required. Under the above-stated principle, the three lots would be viewed as a single lot for zoning purposes, and Callison was, therefore, not at liberty to separate them with the expectation that a building could then be constructed. The corollary of the principle stated in *Seltzer* v. *Board of Appeals of Orleans*, *supra*, is that "landowners may not create dimensional nonconformity if the use of adjoining land they own can avoid or *diminish* the nonconformity." *Burke* v. *Zoning Bd. of Appeals of Harwich*, 38 Mass. App. Ct. 957, 958,

960 (1995), citing *Vetter* v. *Zoning Bd. of Appeal of Attleboro*, 330 Mass. 628, 630 (1953); *Alley* v. *Building Inspector of Danvers*, 354 Mass. at 7-8; *Seltzer* v. *Board of Appeals of Orleans*, *supra*; *Planning Bd. of Norwell* v. *Serena*, 27 Mass. App. Ct. 689, 690 (1989), *S.C.*, 406 Mass. 1008 (1990).

What Callison did, in selling off parcels 28-4 and 28-5, while retaining ownership of parcel 28-2; and what Coneeny did, in building on parcel 28-5 without including the land from parcel 28-4 (then owned by his daughter, see *DiStefano* v. *Stoughton*, 36 Mass. App. Ct. 642, 644-645 [1994]), is rightly characterized as "zoning misbehavior." *Murphy* v. *Kotlik*, 34 Mass. App. Ct. 410, 414 (1993). Each of their actions constituted the creation of unlawful lots and should have been barred by the local zoning authorities. See *Burke* v. *Zoning Bd. of Appeals of Harwich*, 38 Mass. App. Ct. at 958.

That the original misstep was taken earlier by Callison is of no help to Coneeny. See, e.g., *Warren* v. *Board of Appeals of Amherst*, 383 Mass. 1, 13 (1981) (where the owner of a larger tract of land conveyed to another a smaller portion, which did not meet the minimum requirements of the then existing zoning by-law, the new owner was unable to obtain a building permit, and was denied a variance).

Coneeny is in no better position than the defendants in *DiCicco* v. *Berwick*, 27 Mass. App. Ct. 312 (1989). There, the defendants purchased two adjoining lots (lots 5 and 6) which, together, comprised 9,000 square feet. In 1985, the defendants sold lot 5, on which a three-family house was located. Lot 5 alone comprised 4,000 square feet; the minimum lot size required by the by-law at that time was 8,000 square feet. Thus, by selling off the house lot, the defendants transformed what had been one conforming lot into two nonconforming lots (a deficit in frontage was also created). The defendants then applied for and received the variances necessary to construct a three-family dwelling on lot 6. This court, concluding that the trial court judge correctly annulled the decision granting the variances, observed that the defendants "could not create a second buildable lot by selling off a nonconforming lot containing the dwelling." *Id.* at 314.

Here, in 1978, the prior nonconforming structure stood on a combined lot of some 12,000 square feet which, though undersized, was more than 5,000 square feet. When, in 1995,

Callison kept parcel 28-2 (the lot on which the house stood) while selling off parcels 28-4 and 28-5, the house lot area fell below 5,000 square feet, and the prior nonconforming dwelling lost whatever protection it might otherwise have held under § 10. E.1 of the by-law.

It follows from what we have said that, at least by 1995, the structure on parcel 28-2, which had been torn down by Callison in 1979, no longer qualified for an exemption from the two-year limit for reconstruction of pre-existing nonconforming dwellings under § 10.E.1 of the 2001 by-law,[17] and there was no error in the trial judge's determination that Coneeny's building permit was unlawfully issued.

*Conclusion.* After a careful review of this record, we have no occasion to disturb the judge's order for final judgment, which annulled the August 6, 2003, decision of the board, and ordered that the house and foundation constructed on the land of the Bear Hill trustees be removed and that the site be restored as nearly as practicable to its undeveloped state.[18]

*Judgment affirmed.*

[17]As we have determined that reconstruction was impermissible under the by-law, we do not address the additional issues that would otherwise arise:

(a) whether the structure Callison tore down in 1979 was a "dwelling" (see note 15, *supra*);

(b) whether the trial judge was correct in observing that, rather than being a "reconstruction," Coneeny's house was *"new* construction, sharing no architectural features or structural elements with the old, standing entirely on a different part of the lot (and partly on the lot next door), very different in scale and in kind";

(c) whether, as the board concluded, a height variance was unnecessary after Coneeny brought in fill to raise the grade around the house (see notes 8 and 11, *supra*); and

(d) whether, as the board and the trial judge concluded, the new structure was not substantially more detrimental to the neighborhood than the prior structure.

[18]Coneeny's complaint that the judge's order that the house be removed is "draconian," because all the necessary permits were obtained, is unavailing. Given Coneeny's lengthy and intimate involvement in this case throughout adverse judicial action, and warning of potential consequences, Coneeny knew of the potential "invalidity . . . and . . . acted at his peril." *Ferrante* v. *Board of Appeals of Northampton*, 345 Mass. 158, 163 (1962), quoting from *Zahodiakin Engr. Co.* v. *Zoning Bd. of Adjustment*, 8 N.J. 386, 396 (1952); *Elio* v. *Zoning Bd. of Appeals of Barnstable*, 55 Mass. App. Ct. at 432.