Welch, Richard E., J.
INTRODUCTION
This appeal from the Ipswich Planning Board’s approval of a subdivision plan for an approximately 23-acre parcel at 18 Heartbreak Road pits various long-time residents of Heartbreak Road against their neighbors Edward and Anna Fagan. The Ipswich Planning Board approved this subdivision only after lengthy and somewhat tortured proceedings. Initially the Planning Board rejected the preliminary subdivision plan. When a definitive subdivision plan was filed, the Planning Board held extensive hearings but did not act upon it within the required 90 days. By statute it was deemed constructively approved. The Planning Board, however, revoked the constructive approval and then proceeded to disapprove of the definitive plan. While denying approval, the Board, somewhat counter-intuitively, granted various waivers of its regulations. At the same time, the Board suggested various matters that could be altered by the Fagans in order to obtain final approval. Finally, on December 4, 2003, the Planning Board granted approval. This approval contained twelve waivers of the Planning Board’s regulations.
The plaintiffs, whom abut the Fagan property, vigorously disagree with the Planning Board’s approval. They are joined by various neighbors. They claim the proposed subdivision will raise the already high water level around their homes, contribute to traffic hazards on Heartbreak Road, and harm their properties in assorted other ways.
A four-day jury-waived trial ensued which involved extensive testimony of the plaintiff Elizabeth Krafchuk, her neighbors, the defendant Edward Fagan, town officials, and assorted dueling experts. In addition, extensive factual stipulations were offered and an astounding number of documents were placed into evidence. Having considered all these matters, this judge makes the following findings of fact and rulings of law.
FINDINGS OF FACT
Heartbreak Road and Surrounding Area
Heartbreak Road is a narrow 18-to 19-foot-wide, curving rural road in Ipswich that runs between Route 133 and Argilla Road. Although rural in nature, the road is locally known as a shortcut to access the ever-popular Crane’s Beach which lies at the end of Argilla Road. The road is also sometimes used as an informal (and sometimes designated) detour whenever there is a significant traffic blockage on nearby Route 1A or Route 133. The traffic density is somewhat seasonal, peaking in the summer months. Although no formal extended traffic studies have been conducted, the residents of Heartbreak Road estimate a relatively high volume of traffic on the road in recent years. The speed limit is posted as 25 miles per hour. But the law has its limits. Almost uniformly, the residents of Heartbreak Road confirm that the average speed of motorists is between 35 to 40 miles per hour.
Heartbreak Road, which has no sidewalk on either side, hosts an average amount of pedestrians and children on bicycles. It runs through a portion of rather low standing ground. Near the intersection with Argilla Road, Heartbreak Road is often flooded during the spring time. At times there is standing or flowing water covering the road.
Because of the bends in the road, the lines of sight for a motorist are somewhat obstructed. There are no other roads that intersect Heartbreak Road between its beginning on Route 133 and its end at Argilla Road.
The traffic density on the road varies but I accept the estimate of residents who indicate that between 30 to 40 cars an hour use the road during daylight summer hours. It is not a road that would be considered a “low volume road.” The Planning Board implicitly, and correctly, considered Heartbreak Road to be a “collector” street. Namely a street “used primarily to connect local streets to arterial streets” and one which “carries moderate volumes of traffic.” Subdivision Rules and Regulations, Section 1.3.5, Exhibit 2.
Heartbreak Road runs through a relatively rural portion of Ipswich which contains a large amount of wetlands and standing water. As plaintiff Elizabeth Krafchuk, an eighteen-year resident of 10 Heartbreak Road, testified, the amount of water on her property and surrounding properties has increased significantly during the past several years. Ms. Krafchuk had the wetlands boundary on her property surveyed and discovered that the boundary had expanded by forty feet since the last survey. Ms. Krafchuk’s property abuts the Fagan’s property.
Her observations were confirmed by other neighbors such as Dorcas and Donald Rice who have lived at 6 Heartbreak Road (the Krafchuk property lies directly between the Rice and Fagan property) for the past forty-seven years. The Rices have found that water levels have continually risen on their property for the past several years. The Rices and other witnesses who testified for the plaintiffs have observed a direct correlation between increased development in the area and the expanding wetlands and standing water on their property and on adjoining property. Dorcas Rice testified, and I accept her testimony, that the water levels have continued to rise each year, often flooding her backyard. Her husband Donald confirmed that within the last four or five years the water problem has increased to such an extent that their basement sump pump must now operate year-round.
Heartbreak Road contains no storm sewer. There exist no gutters, culverts or ditches along the side of the road. Water that drains from the Fagan’s driveway (approximate location of the proposed Blue Spruce Drive cul-de-sac) runs along the road toward the Krafchuk and Rice properties and empties in the wetlands that exist on and adjoin those properties.
*17 Daniel Deren, a resident of 15 Heartbreak Road, owns a house which is situated directly across Heartbreak Road from the location of the proposed subdivision drive (designated as “Blue Spruce Drive”). He has observed water washing down the Fagan’s driveway (again, the approximate location of the proposed Blue Spruce Drive) across Heartbreak Road and onto his property. Mr. Deren has lived on Heartbreak Road since 1983 and has noticed that the ground water level has risen on his property significantly since 1983.
This judge credits the testimony of the Rices, Daniel Deren, and Elizabeth Krafchuk. The properties abutting the Fagan property are relatively saturated with water. Extensive wetlands are to be found on the properties of all of these people. They have very good reason to be concerned about even a modest amount of more water being deposited on their land by any further development. Likewise, any dangerous traffic condition presented by an intersection between the proposed Blue Spruce Drive and Heartbreak Road would be of a unique concern to them. These residents, even driving carefully and near the speed limit, will encounter the proposed intersection much more often than a general member of the public.
There is no town sewer in this part of Ipswich. All of the residents of Heartbreak Road rely upon septic systems. In addition, Ms. Krafchuk obtains her drinking water from a well on her properly. She is concerned that the rising water levels will harm the functioning of her septic system and pollute her drinking water. A plaintiff such as Elizabeth Krafchuk definitely has “standing” to contest the Planning Board’s approval of the subdivision plan.
The Proposed Subdivision and Intersection
The subdivision in question seeks to subdivide the Fagan property into seven lots. The seven lots would be accessed by a cul de sac designated “Blue Spruce Drive.” The entire parcel is 23.5 acres. Approximately 13 of the acres are wetlands and would not be developed. A conservation restriction would be placed on these wetland acres. Two of the lots (Lots 1 and 2) sit on a higher ridge directly above the Krafchuk properly. A detention basin for storm water is located near these lots and close to the Krafchuk property. This detention basin is designated detention basin B. The proposed subdivision is to contain various other storm water basins. These include detention basins C and D (which are not contested or part of this lawsuit) and infiltration basins A-l and A-2. These two infiltration basins are to be located along the sides of the proposed Blue Spruce Drive where it intersects with Heartbreak Road.
The proposed Blue Spruce Drive is to intersect Heartbreak Road at a T-shaped intersection. The sight distance for a person stopped at the Blue Spruce intersection looking north (to the right) up Heartbreak Road was the subject of much dispute. The expert measurements ranged from 208 feet (defendants’ expert Graham) to 222 feet (plaintiffs’ expert) to 234 feet (Graham hypothesized if next-door neighbor Giza was forced to remove her mailbox) to 269 feet (town expert measured when no foliage on trees).[1] When the dust clears, the most reliable measurement is a sight distance of, at most, 222 feet looking north. This measurement was carefully taken during a time when foliage was on the trees. It did not depend on any hypothetical consideration (in contrast to longer measurements by Graham and Hazarvortian). A car coming from the north would be coming up a 2% to 3% rise. This decreases the stopping time of an ongoing car slightly. Looking south one has a better line of sight, a total of at least 422 feet. The reason for the limited line of sight looking north is a curve in the road. Because of the narrow width of Heartbreak Road, someone who would be turning right (heading north) onto Heartbreak Road from Blue Spruce Drive would need to enter the opposite lane of travel for two or three feet before re-entering the northbound lane of travel.[2]
The Planning Board obviously was concerned with this limited line of sight at the Blue Spruce Drive/Heartbreak Road intersection. See Exhibits 12 and 14. The Planning Board somehow found the north-facing line of sight at the intersection to be 252 feet. It considered that line of sight “minimally adequate.” Under the Planning Board regulations the minimum sight distance at an intersection for a “collector street” is 325 feet.
The Planning Board’s finding of a 252-foot sight distance has no support. Under the Board’s reasoning the 252-foot distance (when compared to the regulation’s mandated 325 feet) was “minimally adequate.” Because the correct distance is actually thirty feet less, the line of sight falls well below what the Board considered “minimally adequate.” Under the so-called “ASHTO” standards (see Exhibit 86), an intersection sight distance of 222 feet is only adequate for vehicular traffic traveling 32 m.p.h. along Heartbreak Road. I accept the testimony that most every car traveling on Heartbreak Road (despite a posted speed limit of 25 m.p.h.) exceeds a rate of 32 m.p.h. All experts agreed that the intersection must be designed for the realities on the ground, not the posted speed limit. The Board’s proposed mitigation measure of erecting two intersection signs and one additional speed limit sign is highly unlikely to bring drivers’ speeds down to the 32 m.p.h. level. The defendants’ own expert civil engineer could not give the requested opinion that the proposed Blue Spruce Drive/Heartbreak Road intersection was safe. Instead, he equivocated. I accept the testimony of plaintiffs’ civil engineering expert, Michael Juliano, that the intersection as designed and approved by the Planning Board is unsafe. In making this determination, I necessarily reject the testimony of the civil engineering expert who had the most limited involvement with this site, Kim Hazarvartian.
*18 Water Detention/infiltration Basins
Under the Ipswich Planning Board regulations, any water detention or infiltration basin must have a minimum of two feet of soil between the bottom of the basin and the level of seasonal high ground water. Planning Board Regulation Appendix VIII 5.C.[3] This two-foot requirement allows for appropriate storm water filtration, protection of ground water, and runoff control. The Board waived the two-foot requirement for the infiltration basins designated A-l and A-2 located near the intersection of the proposed Blue Spruce Drive and Heartbreak Road. According to the Graham/Parker measurements (this was the team whose earlier measurements on Basins C and D were shown to be significantly inaccurate in that they underestimated seasonal high ground water levels by two or three feet) there is only a separation of 9 1/2 inches between the bottom of basin A-1 and the seasonal high ground water level and a 12-inch separation between the bottom of infiltration basin A-2 and seasonal high ground water. The Planning Board justified its waiver of the two-foot requirement on the basis that the developer was to install a pretreatment device in these basins which would remove oils, greases, and larger suspended solids. This court accepts the opinion of Michael Juliano, a professional civil engineer, who opined that these pretreatment devices, while valuable in their pretreatment function, are designed to extend the life of an infiltration basin and do not provide the same function as the two-foot filter of soil beneath the infiltration basin. In other words, these devices do not remove such pollutants as nutrients and dissolved small particles, or a wide range of other pollutants. For these types of pollutants, one must rely upon the filtering effects of two feet of soil. In addition, these pretreatment devices do not regulate storm flows or recharge the ground water nearly as effectively as would the two-foot minimum of soil between the bottom of the infiltration basin and the seasonal ground high water mark. By equating the pretreatment device to two feet of soil filtration, the Planning Board was comparing apples to mangos.
This judge also finds that it is highly likely that the seasonal high ground water level has been mis-measured at basins A-l and A-2 (as it was at other basins on the property).[4] If this is true, these basins could well be at the same level as or below the seasonal high ground water level. In that event, they would not serve any purpose and the risk of flooding would be greatly increased
Storm Water Basin Capacity
Under the Ipswich Planning Board regulations, storm water basins are to have a capacity to handle a so-called “100-year storm.” The infiltration basin A-2 only has the capacity to handle a 10-year storm event. Infiltration A-l has the capacity to handle only a 25-year storm event (and, in all likelihood, only a 10-year storm event should the uphill basin A-2 overflow in a ten-year storm and fill up basin A-l). The effect of overflowing basins A-l and A-2 is obvious. As the defendants’ civil engineer explained, the storm water would overflow the catch basins, run north across Blue Spruce Drive and then out along Heartbreak Road. Because Heartbreak Road has no gutter or culvert system, the water would not simply stay at the edge of the road (as suggested by civil engineer Hugh Graham) but would instead flood the road and flow in a northerly direction and then drain in the wetlands that surround the Krafchuk property. See Exhibit 87 (photo of heavy thunderstorm showing water from Fagan driveway and water from other locations all flowing onto Heartbreak Road). This flooding near the intersection of Blue Spruce Drive and Heartbreak Road would create significant traffic safety issues and create a risk of flooding for Ms. Krafchuk and her neighbors. Given the high water level on the adjourning properties, the failure to comply with the 100-year storm event requirements poses a significant safety issue to the residents of Heartbreak Road.[5]
The Planning Board never addressed the 100-year storm capacity issue and never waived its regulations on these matters. Under Regulations 6.14.2, storm water detention/infiltration basins are required to have the capacity to handle the run-off generated by a 100-year storm. Exhibit 2. The Fagan’s civil engineer went to great lengths to prepare a storm water management report (dated December 19, 2002) that established that storm run-off from the entire site would increase only a modest .3%. See Exhibit 76/77. A later storm water management plan (dated September 3, 2004) made further improvements and promised a slight decrease in post-development run-off. See Exhibit 68. These management plans addressed the requirement of Regulations 6.14.1 that mandated “peak flows and run-off at the boundaries of the subdivision shall be no higher following development than before development, for the 10 and 100 year storm events.” When the first (December 19, 2002) storm water management plan showed a slight increase (of less than .3%) of peak flow run-off, the peak flow regulation was waived by the Board on January 8, 2003 (and this waiver was repeated essentially verbatim in the May and December decisions). As can be seen from the wording used by the Board that waiver related solely to peak flows regulated under Section 6.14.1. The Board erroneously labeled this waiver as one under Section 6.14.2 (which related to capacity, an issue never discussed in the Board’s waiver). This was simply a clerical mistake. The Board waived its regulation under 6.14.1. It never waived the basin capacity issues addressed by 6.14.2.
Proceedings Before the Planning Board
The proceedings before the Planning Board relating to this proposed subdivision were a long and winding road. The Fagans submitted a preliminary subdivision plan on October 5, 2001 and, after many hearings, *19 disapprovals, conditional approvals, revocations of conditional approvals, and public commentary, the Planning Board finally approved an amended or modified definitive subdivision plan on December 4, 2003. During this lengthy process, various Board members missed certain of the substantive meetings, other Board members resigned, and still others were appointed. Adding to the somewhat complicated proceedings is the fact that the Planning Board, on two occasions, voted to disapprove the definitive subdivision plan of the Fagans. But, while disapproving the plan, the Board, at the same time, voted to approve Weavers from the Town’s subdivision regulations. As the Ipswich Director of Planning and Development, Mr. Glen Gibbs, testified, the Board granted waivers of its regulations on January 8, 2003 (and readopted these waivers on March 8, 2003). Gibbs testified that these waivers were not “technically” reconsidered in the Board’s final decision of December 4, 2003 when the Board finally approved the subdivision. Thus, the plaintiffs were in a position which required them to appeal the Board’s “disapproval” of the subdivision plan (a plan that they wished to have disapproved) because of the Board’s granting of the waivers on January 8, 2003. After the Board granted the waivers, the composition of the Board changed before the subdivision plan wás approved. Making things perhaps even more complicated was the fact that the Planning Board’s rationale for granting the waivers also changed slightly between January 8, 2003 and December 4, 2003.
At the risk of numbing the mind, the Planning Board proceedings unfurled as follows. On October 5, 2001, the defendants Edward and Anna Fagan submitted a preliminary subdivision plan to the Planning Board for the 18 Heartbreak Road property. As Mr. Fagan explained to Ms. Krafchuk, the Fagans filed the subdivision plan in order to beat the amended zoning ordinance which was in the wings. Ten days after the preliminary plan was filed, Ipswich amended its zoning ordinance increasing the lot area requirements for this area of Ipswich from a one-acre lot minimum to a two-acre lot minimum. See Exhibits 1, 1A, 3 and 4.
On March 7, 2002, the Planning Board denied the preliminary subdivision plan. See Exhibit 11. On May 3, 2002, the applicants submitted an application for a definitive subdivision plan for the property. See Exhibit 6. This submission was filed slightly less then seven months after the submission of the preliminary subdivision plan.
After appropriate notice was published in the local newspaper, the first public hearing on the proposed definitive subdivision plan was held on June 20,2002. At that time, the Planning Board consisted of Chairperson Leslie Brooks, Joshua Massey, Robert Weatherall, Charles Allen and Michael Ryan. David Santomenna was an “associate” member of the Planning Board at the time. An associate Planning Board member may participate in the hearing but does not vote on such matters as subdivision plans. During the June 20th public meeting, associate member Santomenna recused himself from consideration of the application and he continued to recuse himself from consideration of this project throughout 2002. David Santomenna became a full member of the Planning Board by March 27, 2003. For unknown reasons, Santomenna did not recuse himself from this project once he became a full Planning Board member.[6]
The Board continued the public hearing to the date of July 11, 2002 and then to the dates of July 25, August 22, September 12, October 3, October 24, November 14, December 5,2002 and January 8,2003. As might be expected, during this period of time various members of the Planning Board missed certain of the substantive meetings held. It is more than fair to conclude that most of the substantive evidence relating to this proposed subdivision was submitted by both the proponents and the opponents of this subdivision during the year 2002. All the evidence relating to sight lines, stormwater basins, and related matters were presented during the numerous meetings of 2002. Member Charles Allen missed two meetings (July 25 and September 12, 2003) Michael Ryan also missed two (July 25 and December 5, 2003) Joshua Massey missed one (November 14, 2003) while members Brooks and Weatherall attended all of the hearings. See Exhibit H. On January 8, 2003, the Planning Board discussed and voted on the most recent amendment to the definitive subdivision plan. At that time, the Board voted 5-0 to disapprove the plan and to grant twelve waivers. All of the Board members were present. The Board’s final decision of its January 8, 2003 vote was dated January 18, 2003. See Exhibit 12.
Before the Board voted on January 8, 2003, the parties who later became the plaintiffs in this action submitted a legal memorandum to the Board which asserted that the Board’s actions were in violation of the so-called Mullin rule. See Exhibit 57. The Mullin rule arises from the Appeals Court decision of Mullin v. Planning Board of Brewster, 17 Mass.App. 139 (1983), which held that a planning board decision on a subdivision plan is an adjudicatory proceeding. The members of the board who vote on the plan must have attended the hearings on the plans. The Mullin case involved, at most, two hearings on a proposed subdivision plan. At least two Massachusetts Trial Court judges have refused to apply the Mullin rule in an overly stringent fashion when there are a series of public meetings. These judges have ruled, in essence, that if a planning board member misses a meeting when non-substantive issues were discussed, it makes little difference. Furthermore, if a planning board member misses a meeting where there may have been substantive discussion and presentation but that substantive material was undoubtedly reiterated *20 at a later meeting which the planning board member did attend, the Mullin rule should not apply. See Truman v. Travers, 11 LCR8 (Mass. Land Court) (Jan. 8, 2003) (Kilbum, J.), and Xarras v. Snyder, 8 Mass. L. Rptr. 545, 1998 WL1184169 (Mass. Superior Court) (June 17, 1998) (Fremont-Smith, J.).
After the January 8, 2003 vote, the composition of the Planning Board changed considerably. The chairperson Leslie Brooks retired and, soon after, so did member Joshua Massey.
The next hearing on this matter was held March 27, 2003. By that point, David Santomenna became a full member of the board and no longer recused himself for consideration. A Mr. Timothy Purington had become an associate (non-voting) member of the Board.
In response to the disapproval of the subdivision plan by the Board (the disapproval, one might recall was dated January 8, 2003), the applicant declared that the Board’s failure to render a decision within 90 days of filing the application for the subdivision plan on May 3, 2002 constituted a constructive approval of the plan under Section 81U of Chapter 41. This argument, which counsel for the Town of Ipswich found to have some strength, caused the Board to meet on March 27, 2003. It is more than a fair inference to conclude that the concept of constructive approval only sprung to mind after the Board voted to disapprove the plan. Before Januaiy, the defendants and the Board worked closely together during numerous meetings. See Exhibit 58. The March 27 meeting was held with all current Planning Board members in attendance and was then continued to May 8, 2003.
At the May 8, 2003 hearing the Board voted to rescind the constructive approval and re-adopted the decision of Januaiy 8, 2003. Present at this meeting were all the members of the Planning Board as it was then composed (Massey, Allen, Ryan, Weatherall and Santamenna). Associate member Purington was also present. At the May 8 hearing, the Board did not consider new substantive evidence relating to the subdivision. Most of the discussion (see Board minutes, labeled Exhibit Y to parties stipulation of facts) related to procedural matters. Member Allen, when questioned about the earlier granting of the waivers, stated that “by allowing several of the waivers, it made a better subdivision.” Comments like this reinforce the finding that the Board’s allowance of waivers in its Januaiy 8, 2003 decision constituted a final decision on the matter which was simply re-adopted on May 8, 2003. See Exhibits 16 and 13.
The plaintiffs appealed both the Planning Board’s January 8, 2003 and May 8, 2003 decisions to grant waivers. Those two appeals are two of the cases pending before the court presently. Proving that an adjudicatory body rarely pleases anyone, the Fagans appealed the Board’s decision to rescind the conditional approval and the Januaiy 8th disapproval of the definitive subdivision plan. That appeal is presently pending in the Land Court.[7]
The next substantive hearing on this matter was held on September 11, 2003. By this date, the composition of the Board changed again. Member Joshua Massey had retired and Timothy Purington had become a full member of the Planning Board. Charles Allen was absent at this meeting and for at least one other substantive meeting during the year 2003. His attendance at two other meetings is ambiguous. See Exhibit H. The meeting was continued to October 2, 2003. In general, the fall 2003 meetings concerned environmental assessment and conservation restriction issues.
Another public hearing was held on October 23, 2003. On that date, the Fagans submitted an amended/modified definitive subdivision plan. Exhibit 9. Member Michael Ryan missed the October 23, 2003 hearing. During the hearing, abutters requested that the Board not limit its consideration to the prior reasons for disapproval (e.g. need for environment assessment and conservation restrictions). Instead, the abutters urged the Board to expand its review to reconsider issues such as the prior granting of waiver requests. As the minutes of the meeting indicate, member Charles Allen “and other members expressed their declination to revisit old issues.” See Exhibit HH to joint stipulation of facts. The matter was continued to November 13, 2003. Member Charles Allen was absent. During the hearing, the matters of conservation restrictions and canopy reservations were discussed. Abutters addressed concerns about water problems, the extension of the cul-de-sac, and the proposed retaining pond. The matter was continued to December 4, 2003 with the expectation that the Board would vote upon the application of the amended definitive subdivision plan.
All members of the Planning Board (Allen, Ryan, Weatherall, Santamenna and Purington) attended the December 4, 2003 hearing. The abutters presented their concerns about intersection sight lines, safety, the length of the cul-de-sac and other matters. The Board then voted 4-0 (Weatherall abstaining) to rescind the previous disapproval and approved the definitive subdivision plan as amended. See Exhibit 14 and Exhibit JJ attached to stipulation of facts. In voting to approve the subdivision, the Planning Board adopted the same 12 waivers that had initially been approved on Januaiy 8, 2003. The wording of the waivers, including the rationale, is identical for most of the waivers. For certain waivers there is slight change in the rationale. As to the intersection waiver, the Board inserted an additional sentence: “Board did not believe it could sustain disapproval of subdivision based on this issue.” As to the waiver relating to peak flows, the Board included the language that it took “drainage issues veiy seriously.” Finally, on the waiver regarding the two-foot separation of maximum high *21 ground water level and the bottom of basins A-1 and A-2, the Board provided a different rationale: “Purpose of separation is to protect aquifer. Applicants provision of proprietary water unit mitigates this issue satisfactory." Other than these modest changes, the language granting the waivers is identical in the decisions of January 8, May 8 and December 4, 2003.
The plaintiffs appealed the Board’s December 4, 2003 approval of the subdivision plan. This is the third action pending before the Court. For all practical purposes, the Court can address all three appeals by addressing the appeal of the December 4, 2003 decision as all adopt the same waivers.
The final December 4, 2003 vote by the Board consisted of four affirmative votes (the applicant must receive a majority of 3 out of 5). One affirmative vote came from long-time Board member Charles Allen who missed at least two of the four substantive meetings leading up to the December 4, 2003 vote (and who missed two of the substantive meetings in 2002). The other member of the Board casting an affirmative vote who had been on the Board throughout these proceedings was Michael Ryan. He missed the substantive meeting of October 23, 2003 (and three others in 2002). The other two affirmative votes came from David Santamenna and Timothy Purington. Neither of these two had been on the Board at the time of the critical January 8, 2003 vote which granted the waivers. Santamenna had recused himself as an associate member at the time and Timothy Purington was not even an associate member. These two members either missed or were recused from all of the substantive presentations concerning the proposed waivers throughout the many meetings in 2002.
The record shows that much of the substantive information that the Board relied upon in its January 8, 2003 decision was not resubmitted to the Board in the months following the January 8, 2003 decision. Instead, the 2003 hearings concerned matters relating to the reasons for the prior disapproval (e.g. environmental assessments and protective covenants). The Board, on at least two occasions, indicated its disinclination to hear further evidence or to reconsider its decision regarding the earlier waivers.
As the planning director Glenn Gibbs testified, the Board does maintain minutes of its meetings and Board members are encouraged to review the minutes of the prior meeting before they are adopted at the next hearing. A review of the minutes of the meetings, however, shows that the minutes are necessarily sketchy as to the substance of the information presented to the Planning Board. A Planning Board member who is not at the hearing would not gain a great deal of knowledge regarding the substance of the hearing by reviewing the minutes. Furthermore, member Santomenna had recused himself from the entire project throughout the year 2002. Member Purington was not associated with the Planning Board during 2002 and would have no reason to review the minutes of those hearings. This is not a case where a board member misses a meeting where merely procedural matters are discussed or attends a later meeting where the substantive content of the earlier missed meeting is reiterated. Instead, this extended and rather convoluted procedural history shows that certain members (such as Michael Ryan) missed three important substantive meetings before granting the January 8 waivers. Others missed solitary substantive hearings (such as Joshua Massey and Charles Allen). More troublesome still is the Board as it was constituted during most of 2003. Two of the four votes (Purington and Santomenna) must be considered mere “rubber stamps” when it comes to the approval of the subdivision because of little or no involvement in the 2002 hearings. The two other members casting affirmative votes (Allen and Ryan) missed substantive hearings in 2003. All of this seriously undermined the validity of an adjudicatory hearing on this subdivision. The decision makers were playing musical chairs and it is very unclear how much substantive knowledge each of them had at the time that they cast their critical December 4, 2003 votes.
LEGAL ANALYSIS
Standard of Review
The trial court’s duties in hearing and deciding appeals of decisions made by a town planning board pursuant to G.L.c. 41, §8 IBB, are to conduct a hearing de novo, find the relevant facts, and determine the validity of the planning board’s decision. Batchelder v. Planning Bd. of Yarmouth, 31 Mass.App.Ct. 104, 106 (1991), citing Fairbairn v. Planning Bd. of Barnstable, 5 Mass.App.Ct. 171, 173 (1977). See also Kuklinska v. Planning Bd. of Wakefield, 357 Mass. 123, 130 (1970) (in passing on the correctness of the board’s decision, it is incumbent on the court to make its own findings). In ruling on the validity of the board’s decision, the court must determine whether the board’s decision exceeded its authority. Strand v. Planning Bd. of Sudbury, 7 Mass.App.Ct. 935, 936 (1979). In other words, the court decides whether the reasons stated by the planning board in rejecting or approving the proposed subdivision were within the scope of its authority under its rules and regulations. Massachusetts Broken Stone Co. v. Planning Bd. of Weston, 45 Mass.App.Ct. 738, 742 (1998). Judicial review of a decision of a planning board approving or denying a subdivision plan is confined to the reasons for disapproval or approval stated by the board. Massachusetts Broken Stone Co., 45 Mass.App.Ct. at 741-42. The burden of proof is on the person objecting to convince the court “that the board exceeded its authority and acted improperly.” Strand, 7 Mass.App.Ct. at 936.
Standing
The defendants contend that the plaintiffs lack standing. Their argument is that Ms. Krafchuk and other abutters will not be uniquely harmed by this *22 proposed subdivision. Their interests, the argument goes, are not different from those of the general public.
As can be seen from the Court’s factual findings, this argument has no merit. Ms. Krafchuk plainly has a potential to suffer a particular and individualized harm as a result of this proposed development. It would be her land which is likely to become more saturated with water. It will be her septic system and water well that may be threatened. And she will be the one who will drive through the proposed intersection of Blue Spruce Drive and Heartbreak Road with much greater frequency then an average citizen of the Town of Ipswich. She plainly has standing. Nickerson v. Zoning Board of Appeals of Raynham, 53 Mass.App. 680, 682 (2002).
At trial there was very little testimony regarding the beneficiaiy of the plaintiff Buttonwood Trust. The Buttonwood Trust owns land which adjoins (to the southeast side) the Fagan property. As an abutter, the Buttonwood Trust is presumed to have standing. The defendant presented nothing at trial to rebut this presumption. Marashlicm v. Zoning Board of Appeals of Newburyport, 421 Mass. 719, 721 (1996).
Zoning Freeze
This thorny legal issue begins with Chapter 40A, §6 which states in pertinent part:
If a definitive plan, or a preliminary plan followed within seven months by a definitive plan, is submitted to a planning board for approval under the subdivision control law... the land shown on such plan shall be governed by the applicable provisions of the zoning ordinance or by-law, if any, in effect of the time of the first such submission while such plan or plans are being processed under the subdivision control law, and, if such definitive plan or amendment thereof is finally approved, for eight years from the date of the endorsement of such approval . . . (emphasis added).
The issue in this case is whether the defendants are entitled to the so-called “process freeze” provided by this statute; in other words, should the defendants’ definitive subdivision plan, and the various amendments and modifications to it, be governed by the less restrictive zoning by-law which was in existence at the time the preliminary plan was filed.
Everyone agrees that the preliminary plan was filed before Ipswich changed its zoning by-law for this area of the town (from one-acre minimum lot size to two-acre lot size). Everyone also agrees that the Fagans filed a definitive subdivision plan within seven months of filing the preliminary plan. The dispute arises over whether the Fagans’ definitive subdivision plan, which was disapproved on two occasions, amended and modified, and then approved on December 4, 2003 was “finally approved” for purposes of the Chapter 40A, §6 zoning freeze.
Case law does not give a definitive answer to this issue. There is no doubt that, had the Board approved the definitive subdivision plan which had been filed within the seven-month period (even if that approval was conditioned on the developer doing certain things), the developer would be entitled to the benefit of the zoning freeze. Heritage Park Development Corp. v. Town of Southbridge, 424 Mass. 71 (1997). There is also little doubt that if the Planning Board disapproved the definitive subdivision plan, even though the developer could come back with an amended plan addressing the deficiencies found by the Board, the developer is not entitled to the zoning freeze. Arenstam v. Planning Board of Tyngsborough, 21 Mass.App. 314 (1990). In this case, there is a twist. The Fagans filed their definitive subdivision plan within the seven-month period, hearings were held by the Planning Board, but the Planning Board took no action within the ninety-day period following the filing of the subdivision plan. Under Chapter 41, §81U, the failure to take final action on the definitive plan within ninety days is deemed to be approval of the plan. This statutory approval is considered a “constructive approval.” See, e.g., Windsor v. Planning Board of Wayland, 26 Mass.App. 650, 653 (1988); Zaltman v. Town Clerk of Stoneham, 5 Mass.App. 248, 252 (1977). There is little doubt here that the Board failed to take any final action on the Fagans’ initial definitive subdivision plan within the ninety-day period and, thus, it was “constructively approved.” Defendants, therefore, argue that this constructive approval is an equivalent of a final approval and entitles them to the zoning freeze.
The problem with this argument is that the statute does not consider a “constructive approval” to be a “final” approval unless the Ipswich Town Clerk issued a certificate “stating the date of the submission of the plan for approval, the fact that the Board failed to take final action, and the approval resulting from such failure has become final.” G.L.c. 41, §81V. There is no evidence that such a- certificate was requested or issued. Thus the constructive approval never became “final.” Based upon the language of §8IV, a “constructive approval” obtained as a result of the Planning Board’s failure to act on the definitive plan within the applicable ninety-day period is part of the “process” and not a “final approval.” When the Fagans obtained a constructive approval, they still were entitled to the “process freeze,” namely, their subdivision plan could be considered by the Board under the requirements of the prior zoning by-law.
All of this changed, however, once the planning board rescinded the constructive approval (which is permitted by c. 41, §81W) and disapproved the plan on May 8,2003. See Exhibit 13. The Arenstamdecision teaches that this disapproval (even though it is part of the process aimed toward final approval) ends the “process freeze” and denies the Fagans the benefit of being grandfathered under the earlier zoning by-law. This is because the Fagans filed an amended or mod *23 ified definitive subdivision plan on October 23, 2003 after the disapproval. See Exhibit 9. As the Appeals Court reasoned:
To preserve the sense of §6 [the zoning freeze], its reference to amended definitive plans must be read to apply only those amended plans filed with the Board within the seven month period after submission of the preliminary plan. Any definitive plan, filed more than seven months after the preliminary plan, is treated as new plan . . .
Aremstam, supra at 317, quoting Green v. Board of Appeal of Norwood, 358 Mass. 253, 257 n.4 (1970). Thus, the May 8, 2003 disapproval (and rescission of the conditional approval) ended the process freeze.
Still, like a novel that goes on too long, there is another wrinkle. The defendants appealed the Board’s May 8th rescission of constructive approval and the Board’s December 8, 2003 disapproval of the initial definitive subdivision plan to the Land Court. See Exhibit AA to the stipulation of facts. A review of the docket of that case reveals that the case has lain dormant since an answer was filed. That Land Court appeal applies to “the land shown” on the subdivision plan and not the plan itself. The appeal also extends the “process freeze” provided by §6. Massachusetts Broken Stone Co. v. Town of Weston, 430 Mass. 637 (2000). Because that appeal is still pending, one normally would await the Land Court’s decision. The Land Court appeal, however, only preserves “the grandfather protection of §6 if it should be determined that the plan was, in fact, entitled to approval.” Arenstam, supra at 317. To put it simply, if the Land Court ruled that the initial definitive plan should have been approved, the Fagans win and have the benefit of the zoning freeze. Should they lose, there is no freeze and there is no doubt that the definitive subdivision plan approved on December 4, 2003 fails to meet the current zoning requirements. As such, the Planning Board would be held to have exceeded its authority.
In this case, there is no need to await the Land Court’s decision. The parties have presented all the issues to this court for decision. As part of the three cases pending here, the court finds that the Board should not have granted certain important waivers in its January 8, 2003 disapproval. Because the waivers should not have been granted, the Board’s January 8th disapproval must be affirmed. This finding, of course, has the effect of rendering the Land Court case moot. But that is hardly a surprise given the overlap of issues between the various appeals. Because the developers were not entitled to approval of their initial plan, the “grandfather protection of §6" has expired. The Planning Board’s December 4th approval of a plan that violates the current zoning requirement is necessarily invalid.
Mullin Rule
I find that everyone involved in this subdivision process, the developers, the Planning Board, the opponents, and the civil engineers, all acted in good faith. The Planning Board members, in particular, volunteered huge amounts of time and effort in reviewing this proposed subdivision. As this Court already has set forth in laborious detail, the. proceedings in this case were extremely protracted. Various members of the Planning Board missed various substantive meetings. Perhaps more importantly, the composition of the Planning Board changed significantly during the review and approval process.
In Mullin v. Planning Board of Brewster, 17 Mass.App. 139 (1983), the Appeals Court reaffirmed that a planning board acts in an adjudicatory capacity. When this occurs, all members of the Board who join in the decision must have attended the hearing on the matter on which they are voting. In Mullin, this was an easy decision to make because the hearings were limited. As described above, at least two trial judges have applied the Mullin rule in a flexible manner to allow Planning Board members to miss non-substantive meetings or even a substantive meeting when the same substance was later reiterated at a later meeting. Those practical exceptions do not apply in this case.
The developer needed three votes for approval. See McElderry v. Planning Board of Nantucket, 431 Mass. 722 (2000) (affirmative vote of majority of the Board needed). In this case, two of the Board members voting to approve were not even members of the Planning Board during all the substantive meetings of the year 2002. The other two voting in favor, while members of the Board in the year 2002, missed various substantive meetings during both years, 2002 and 2003. This Court cannot confidently conclude that the members voting to approve this subdivision plan had the requisite substantive knowledge to make a fair and informed decision. Therefore, the proceedings in this case violated the requirement of attendance at the substantive hearings set forth in the Mullin decision. Furthermore, the four members who voted to approve the plan cannot be considered a legitimate majority of the Board since at least two of them were not members of the Board during the entire approval process.
The application of the Mullin rule and the Arenstam “zoning freeze” analysis does not produce an overly harsh result in this case. This is not a situation where a town has adopted “onerous amendments to the zoning by-law after submission a preliminary plan which is opposed by segments within the community.” Massachusetts Broken Stone, supra, quoting Heritage Park Dev. Corp. v. Southbridge, supra at 75-76. To the contrary, here a developer tried to get the jump on a zoning amendment that was scheduled to take effect in a few days. The developer quickly filed a preliminary plan and then submitted a considerably different definitive plan. That definitive plan needed much work. *24 The extended and protracted hearings and the later disapprovals were much the fault of the developer’s haste in filing a plan. Had the developer taken the time to present a more comprehensive plan; the proceedings before the Board would not have been as protracted.
The Board’s Decision
The Planning Board’s final approval cannot be justified on substantive grounds.
As detailed above, the Board arbitrarily selected a sight line distance from the proposed Blue Spruce Drive/Heartbreak Road intersection of 252 feet. This was a palpable error that led them to approve what this Court has found to be an unsafe intersection. The Board’s waiver on this issue is insupportable. It is contrary to the public interest and inconsistent with the intent and purpose of the subdivision control law. See G.L.c. 41, §81M.
The Board’s waiver of the two-foot soil separation between the bottom of the infiltration basins A-1 and A-2 and the high seasonal ground level also cannot be justified. The Board’s rationale (the developer’s installation of a pre-treatment device) in no way mitigates the reasons for the regulatory requirement of the two-foot ground separation. The Board’s waiver is contrary to the public interest and public safety. It is contrary to its own regulations and the waiver cannot be justified.
Particularly troubling is the Board’s failure to address the significant flooding issues presented by the lack of capacity in infiltration basins A-l and A-2. As stated previously, the Board never waived these issues. The flooding potential from this lack of capacity is hardly speculative. In the event of a ten-year storm, it is likely that there will be considerable water run-off onto Heartbreak Road and adverse consequences to the downhill property of abutting land owners. There is no adequate evidence that the Board consciously waived this important requirement. See Meyer v. Planning Board of Westport, 29 Mass.App. 167, 170 (1990). (“Subdivision control also has as a major purpose ensuring that the subdivision provides adequate drainage . . . without harmful effect to adjoining land . . .”). The Board’s failure to waive these issues or to consider them fully is in violation of its own regulations and contrary to the subdivision control law.[8]
CONCLUSION
At one of the many hearings on this matter, then Board member Joshua Massey responded to a Heartbreak Road resident’s concerns about the proposed subdivision with this statement: “It is the properly owner’s right to develop and abutters should not deny that right.” Exhibit Y to stipulation of facts (minutes of May 8, 2003 Planning Board meeting). Perhaps the minutes take the statement out of context. Perhaps Mr. Massey spoke in haste. Nevertheless, the statement is illustrative. A property owner does have the right to develop his or her property, but only within the confines of legitimate land use regulations. No property owner has the unfettered right to subdivide his or her property. The abutters to such a developer have an equal right to question and petition any public board which is to approve such development or subdivision. This is particularly true when the developer seeks waivers from legitimate subdivision control regulations. In this case, the abutters to the Fagan property had very good reason to question the Planning Board concerning its process and its decision.
For the reasons set forth above, the December 4,2003 decision of the Planning Board is reversed and vacated. Furthermore, the decision to grant the waivers set forth in the Planning Board’s decisions of Januaiy8,2003 and May 8, 2003 are vacated. The decision to approve the definitive subdivision plan and the waivers was beyond the authority of the Board and was erroneous. Judgment shall enter on Counts I, II, V, VII, VIII and X of Krafchuk I; Counts I, II, V, VII, VIII, and X of Krafchuk II; and Counts I, II, III, VI, VIII and I of Krafchuk III. This matter is remanded to the Planning Board in order that it may take any further action consistent with this opinion. This is a final order.

TheTown hired civil engineer Hazavortian to measure the sight distance. No foliage existed when he measured the distance in November. Hazavortian testified that he would “guess” where foliage would be.

This fact and the slight rise in elevation appear to roughly cancel each other out.

As Town Planner Glen Gibbs testified, the Planning Board regulations govern storm water basins whether designated detention basins or infiltration basins. Indeed, the two-foot soil minimum is particularly applicable to infiltration basins that release water from the bottom of the basin.

Basins A-l and A-2 were never remeasured by the DEP or other civil engineers. When Basins C and D were remeasured in the presence of DEP, the considerable errors were discovered.

The plaintiffs also contend that detention basin B does not comply with the 100-year storm requirement. Based upon civil engineer Hugh Graham’s testimony, I find the basin does meet the requirements.

The reasons for Santomenna’s recusal are unknown. Other “associate” Planning Board members who followed Santomenna (e.g. Purinton and Monahan) did not recuse themselves. See Exhibit H to Stipulated Facts.

Neither side has requested to consolidate the Land Court case with these three pending appeals. No party has requested a stay of these cases while the Land Court considers the Fagan’s appeal. To the contrary, the parties have presented all of the issues to this court for decision. See, e.g. Defendant’s Requests for Rulings of Law.

The plaintiffs also contest the Board’s waiver of the maximum cul-de-sac length (granting a waiver from the 600-foot regulatory maximum to the requested 750-foot length). The plaintiffs have failed to meet their burden of proof on this issue. The Board’s trade off between a “two-headed” cul-de-sac (that met the 600-foot requirement but promised much more pavement) and the 750-foot cul-de-sac is the type of judgment call that the Board is entitled to make. This particular decision “is one as to which reasonable minds might in good faith differ ...” Arrigo v. Planning Board of Franklin, 12 Mass.App. 802, 809 (1981). Thus, the waiver should be affirmed.