LOVACO, INC. *vs.* ZONING BOARD OF APPEALS
OF ATTLEBORO.

Bristol. January 16, 1986. — December 4, 1986.

Present: ARMSTRONG, KASS, & FINE, JJ.

*Zoning,* Bond, Special permit, Earth removal, Conditions, Hearing.

On an appeal from a zoning board's grant of a special permit for the extension
of a golf course with attendant earth and gravel removal with the condition
that the developer file a bond in the amount of $900;000 guaranteeing
its completion of the proposed project, the judge was correct in annulling
the board's decision and remanding the case for further consideration,
where evidence before the judge supported his finding that the estimates
used by the board in setting $900,000 as the amount of the bond were
received after the board's hearings had been concluded without an oppor-
tunity for rebuttal, and where there was testimony before the judge that
the $900,000 figure might well be excessive. [241]

A municipal zoning board had authority to require, as a condition of a special
permit for the extension of a golf course, that the work contemplated
by the permit be undertaken or completed and that a bond be filed to
ensure performance, in circumstances where the board merely directed
that the project be done as proposed if done at all and where the earth
removal necessary to the project would not have been lawful under the
zoning ordinance without the construction of the golf course extension.
[241-243]

CIVIL ACTION commenced in the Superior Court Department
on April 17, 1984.

The case was heard by *John D. Sheehan,* J.

*Ronald G. Koback,* City Solicitor, for the defendant.

*John P. Lee* for the plaintiff.

ARMSTRONG, J. The defendant (board) appeals from a deci-
sion which held that a condition the board attached to its grant
of a special permit application was in excess of the board's
authority. The condition was a requirement that the plaintiff

(applicant) file a bond in the amount of $900,000 guaranteeing its completion of the proposed project: namely, the extension of a golf course.

This is the relevant background. The applicant owns a tract of land in excess of four hundred acres, part of which is devoted to a nine-hole golf course. The land is in a single-family residential zone, in which a golf course is a lawful principal use subject to special permit, and earth or gravel removal, also subject to special permit, is lawful only as an accessory use. In 1981, the applicant sought the requisite permit for a project that envisioned expansion of the existing course to eighteen holes, the creation of a pond (to be used for irrigation of the course), and earth and gravel removal within the proposed course amounting to approximately 400,000 cubic yards.

The special permit was granted over substantial neighborhood opposition, much of it directed to the earth and gravel removal. A condition of the permit required the applicant to post a $300,000 performance bond "to insure completion of the project or restoration of the land." Another required that the "entire project . . . be so designed to be completed within three years from the decision date." The duration of the permit was one year; the applicant was to apply for renewals. A year later, in late 1982, despite neighbors' complaints in the interim concerning stone-crushing operations on the site and other annoyances, some of which led to litigation, the board renewed the special permit, subject to the same performance bond condition imposed a year earlier.

A year later, on the second renewal application, the board, now concerned with delay in the project, again renewed the permit but required "a performance guarantee of $900,000 . . . for the completion of said nine (9) hole golf course, with the amount of the bond to be reduced by $300,000 on the completion of the first three (3) holes and $300,000 for the next three holes with the remaining $300,000 to be retained until the project is determined to have been satisfactorily completed. . . . Failure to post said bond by [April 30, 1984] shall make the grant of this permit null and void and shall constitute just cause for the City . . . to enforce all rights it has against any

and all sureties and all bonds, posted by the [applicant] since the original grant of the permit on December 3, 1981."

It is this bond provision that the judge ruled invalid. Two reasons for the ruling appear. First, the board did not receive evidence in its open, public hearing on the application for renewal which furnished a basis for the $900,000 amount. The evidence before the judge[1], some of it documentary, supported his finding that the estimates used by the board in determining $900,000 to be the amount necessary to construct the course were received after the hearings had been concluded. There was no evidence of opportunity for rebuttal. In light of testimony that the figure of $900,000 might well be excessive, the judge was correct in annulling the decision and remanding the case to the board for further consideration.

A second reason for the judge's decision presents a more difficult issue and one which will arise again unless resolved. Relying on *Middlesex & Boston St. Ry.* v. *Aldermen of Newton,* 371 Mass. 849 (1977), the judge ruled that the board lacked the authority to require, as a condition of a special permit, that the work contemplated by the special permit — in this case, the enlargement of the course to eighteen holes — be undertaken or completed. In the *Middlesex & Boston St. Ry.* case the court had held that the municipal permit-granting authority could not, as a condition of permitting a fifty-four unit apartment project, require that five of those apartments be set aside for low income tenants. If conditions mandating the provision of low income housing fall outside the purview of a permit-granting authority, the judge reasoned, so too do conditions mandating the construction of a golf course.

Two factors distinguish the *Middlesex & Boston St. Ry.* case from this one. There the construction of low income units was not proposed by the applicant: it was an extraneous requirement imposed by the board as a condition of its approval of the project applied for. Here the project applied for was the con-

---

[1] The minutes of the hearing on the second renewal application were not put in evidence and may have been unavailable. No objection was made to testimony concerning what transpired at the hearing before the board.

struction of the expanded golf course; the earth removal and the pond were component parts of the golf course project.[2] The board merely directed that the project be done as it was proposed if done at all. A second distinction arises from the fact that earth removal is lawful under the Attleboro ordinance only as an accessory use. The ordinance would be violated if the applicant should be permitted to remove the gravel without constructing the course.

The latter had been a source of concern from the outset. At the initial hearing in 1981, abutters had expressed the view that the expanded course would be a desirable amenity for the neighborhood, but at least one expressed a fear that the applicant's real purpose was not to build the course but instead to strip the gravel. The applicant was a subsidiary of a company in the business of sand and gravel production. The abutters' reservations were doubtless exacerbated by a contention made by the applicant in later seeking a reduction of the original $300,000 bond: namely, that the condition of the bond, completion of the course or restoration of the land, gave the applicant the option of simply smoothing the surface, restoring the topsoil, and seeding. It seems reasonably clear, however, that the board's original purpose in fixing the amount of the bond at $300,000 (and, later, at $900,000) was to ensure completion of the course.[3]

At least in the circumstances of this case, the board (provided it followed proper procedures) could require a bond ensuring completion of the project. The removal of gravel would necessarily precede construction of the new holes. The danger was manifest that an unscrupulous developer could propose a golf

---

[2] The earth and gravel removal was necessary to contour the land for the course layout. The pond was to serve both as a water hazard in playing certain holes and a component of the drainage and irrigation systems.

[3] The $300,000 figure was originally based on the testimony of the applicant's president that construction would cost between $15,000 and $25,000 per hole. (The high figure was mutiplied by ten, because one of the original holes was to be relocated; then a factor was added for inflation.) After the second renewal hearing the board, through city officials, elicited higher estimates from independent sources with experience in golf course design and construction.

course expansion as a pretext to engage in earth removal that would be unlawful otherwise. A bond limited to restoration in the narrow sense of replacing topsoil and reseeding would not adequately protect the city. A bond requiring restoration of the land to the status quo ante would involve economic waste and, on the evidence before the judge, would not be significantly different in amount from one requiring construction of the course. In this appeal we need not decide whether the $300,000 bonds did or did not protect the city against a failure to construct the additional holes. We only decide that the $900,000 bond required by the second renewal decision, which was clearly conditioned on completion of the course, was not in the abstract beyond the authority of the board.[4]

The board argues, correctly, that it would ordinarily be error for the court to annul a substantial condition attached to the grant of a special permit, allowing the permit to stand without the condition. *Ploski* v. *Zoning Bd. of Appeals of Somerset,* 7 Mass. App. Ct. 874, 875 (1979). *Board of Appeals of Dedham* v. *Corporation Tifereth Israel,* 7 Mass. App. Ct. 876 (1979). *Selectmen of Stockbridge* v. *Monument Inn, Inc.,* 8 Mass. App. Ct. 158, 163-164 (1979). The court's order does not, however, allow the permit to stand without the condition. The implicit purpose of the order remanding the matter to the board is to permit the board to reconsider its decision in its entirety.[5] The

---

[4] Such a condition is authorized generally by § 17-9.4B of the Attleboro zoning ordinance, which states that the "special permit granting authority shall . . . impose . . . such additional conditions as it finds reasonably appropriate to safeguard the neighborhood, or otherwise serve the purposes of this ordinance. . . ."

[5] It is premature to consider at this stage the extent to which the board is limited by considerations of fairness in imposing more onerous conditions on successive permits for a single project. The evidence before the board on remand may well cause the board to reduce the bond required to a figure at or near that of the original bond. More important, it is obviously not in the interest of the city, the neighborhood, or the applicant to leave the land indefinitely in a scarred and unuseable condition. While the applicant had fallen somewhat behind the three-year completion schedule envisioned in the original decision, the record of the proceedings indicates that the board may itself have been unrealistic in seizing on the most optimistic estimates of the probable duration of the work. The record before us does not indicate

content of the court's order was correct. Because the effect of the order was to remand the case for reconsideration it was, technically, not a judgment (although so styled) but an interlocutory order and thus not appealable. See *Roberts-Haverhill Assoc.* v. *City Council of Haverhill,* 2 Mass. App. Ct. 715, 719-720 (1974). As in that case we have discussed the dispositive issues, which were fully briefed, to expedite the proceedings.

*Appeal dismissed.*

---

that the applicant had engaged in any excavation not envisioned in the original plans for the expanded course. In the circumstances it would seem prudent for all parties to work out together a realistic timetable for completion of the excavation and construction in sufficient detail to avoid repetitions of the misunderstandings that have worked to everyone's disadvantage.