Garsh, E. Susan, J.
This is an appeal, pursuant to G.L.c. 40A, § 17, from a decision of the Planning Board (the “Board”) for the Town of Medway (the “Town”) to grant a special permit with conditions to Barberry Homes, Inc. (“Barberry”), the plaintiff. Barberry objects to the requirement that it make a mitigation payment to the Town to be used to support construction of an addition to the Town’s Senior Center. For the reasons that follow, the Board’s decision is vacated and the matter is remanded to the Board.
FINDINGS OF FACT
Based on all the credible evidence, which includes oral testimony at an evidentiary hearing, exhibits, and stipulations of fact, and the reasonable inferences drawn from that evidence, the court finds the following facts.
On September 1, 2006, Barberry, a duly organized Massachusetts corporation, filed an application for an Adult Retirement Community Planned Unit Development (“ARCPUD”) under the Town’s Zoning Bylaw, Section V, Subsection U (the “Bylaw”). Barberry sought a special permit to construct an ARCPUD on a fifty-one-acre parcel of land located in an Agricultural Residential I Zone at 61-83 Winthrop Street (the “Property”). The application requested a special permit under the ARCPUD Bylaw to construct eighty-six units, consisting of fifty-two single-family homes and thirty-four attached town houses, as well as a community center with an attached retail store. The development was referred to as Daniels Village. Ten percent of the proposed units were to be affordable units pursuant to the Bylaw.
In January of 2006, several months before filing its application, Barberry had an informal pre-application meeting with the Planning Board. At that time, it showed the Board a plan for the design of an adult retirement community that had one hundred and eighteen units. The Board appeared generally receptive. The number of units and layout differed from the plan ultimately submitted to the Board for approval.
On June 12,2006, over two months before Barberry filed its application for a special permit, the Town voted to amend the Medway Zoning Bylaw, Section V, Use Regulations, Sub-Section U, Adult Retirement Community Overlay District, Section 4(c), ARCPUD General Standards, by adding the following provision:
At least 10% of the total number of ARCPUD residential dwelling units, rounded up to the next higher integer, shall be designated and made available as Affordable Housing Units as defined in this Zoning Bylaw.
The addition of the affordable housing requirement adversely impacted Barberry’s profit projections.
According to the Bylaw, the purpose of the Adult Retirement Community Overlay District is “to advance the public health, safety and welfare by specifically providing for the development of retirement commu *255 nities within Medway that provide a choice of housing opportunities to senior residents and accommodate the long-term social, cultural, recreational and continuing care needs of these citizens.” The Bylaw provides that ARCPUDs will be authorized only by Special Adult Retirement Community Overlay District Permit granted by the Board. It states that “(i]t is intended that an ARCPUD development provide a range of housing types and facilities that are responsive to the socio-cultural, healthcare and recreational needs of senior residents.” The age restriction limits the dwelling units to occupancy by seniors, age fifty-five or older, and their spouses of any age.
Nothing in the Bylaw requires an ARCPUD to have a community center. The Bylaw’s ARCPUD General Standards provide, however, that the ARCPUD, upon approval by the Board, may include a community center or community buildings intended for use and benefit of the ARCPUD residents provided that 1) such uses do not occupy more than ten percent of the gross building floor area constructed within the approved ARCPUD; 2) in the opinion of the Board, “such use enhances the general purpose of this ARCPUD and enhances better site and community planning”; and 3) the Board finds that adequate assurances and covenants exist to ensure proper maintenance of such facilities by the residents, owners or their agents, who must bear all expenses related thereto. The General Standards also contains a formula for determining the maximum number of permitted housing units in an ARCPUD, but an applicant or developer of an ARCPUD is not entitled to the maximum number of housing units. Rather, the allowance of increased density, up to the calculated maximum number of housing units for the given ARCPUD site, is at the discretion of the Board based on evaluation of the proposed development plan, its impacts, and its benefits to the commu-niiy.
Pursuant to the Bylaw, in order to allow a special permit for an ARCPUD, the Board must review and make findings that certain specified requirements and features of an ARCPUD are satisfied in the proposed development. Those specified requirements and features include “that the ARCPUD is consistent with all ARCPUD general standards” and that the ARCPUD is consistent with the goals and objectives of the Town’s Master Plan.
The Bylaw specifies certain conditions that, depending on the nature of the particular ARCPUD and its uses, the Planning Board may require as a condition of any special permit. Nothing in the Bylaw expressly authorizes the Board to identify and assess mitigation fees.
The Board has Rules and Regulations governing issuance of special permits for an ARCPUD. The General Criteria for approval or denial states that the granting of an ARCPUD Special Permit is discretionary and that the Board, as a condition of granting approval of an ARCPUD Special Permit application, may impose reasonable requirements to promote the health, convenience, safety and general welfare of the community and to benefit the Town. If the Board chooses to impose such a condition, it is required to endorse it on the ARCPUD plan to which it relates or set forth a separate instrument to be attached thereto, to which reference is made on such plan and which shall be deemed to be a part of the plan. The Board’s Rules and Regulations also provide that the Board may “grant, grant with conditions, deny, or grant leave to withdraw an application for an ARCPUD Special Permit...” There is no express authority to require a mitigation payment to fund expansion of town structures.
The Planning Board opened the public hearing on the application on September 26, 2006. Additional public hearings were held on October 10, 2006, November 2, 2006, November 28, 2006, December 5, 2006, January 9, 2207, February 13, 2007, March 13, 2007, and March 27, 2007, at which time the Board voted to close the public hearing.
James Williamson (“Williamson”) acted as the agent for Barberry during the public hearings before the Board. He oversees Barberry’s permitting process. Williamson attended all the public hearings on the application. He had authority to and did make various agreements on behalf of Barberry with respect to matters requested by the Board.
During the course of the public hearings, a number of changes were made to the proposal. At the initial public hearing sessions, Board members commented on issues such as massing and density, circulation, preserving natural features, preserving open space, and providing a central open area. The Board had some concerns about the layout, density and integration of open space with abutting land expected in the future to be Town open space, and the Fire Department was concerned with the level of access afforded. Barberry agreed to provide additional access and to eliminate some units in order to create more flow into the open space and to increase the visibility of the open space. Barberry submitted revised plans that, among other things, reduced the number of units to eighty and eliminated the community center and retail store.[2] Barberry set aside 10.4 acres as permanent protected open space.
After Barberry eliminated the proposed community center, the Board asked it to make a mitigation payment toward the expansion of the Town’s Senior Center. The sum requested was a payment of $120,000 to the Town, representing $1,500 per unit. The sum requested was derived by the Board calculating the per-unit donation that a different developer had offered to make to the Town for expansion of the Senior Center in connection with that developer’s ARCPUD application. The Board, which wished to act in a way that was consistent with the previously approved ARCPUD, multiplied the other developer’s voluntary *256 per-unit contribution by the number of units Barberry proposed to construct. The formula is based entirely on what this other developer had deemed to be in its best economic interests as part of the give and take during that developer’s application process.
Residents of the other ARCPUD have availed themselves of the services of the Senior Center. The Senior Center has a concern about its ability to service all the seniors in the Town. It is likely that a development geared to persons over fifty-five, such as the proposed ARCPUD, would have some impact on the existing senior center in the Town, but there is no credible evidence quantifying the extent of the likely impact. There is no evidence as to the number of residents already living in the Town who are expected to move to the ARCPUD as opposed to the number of residents now living outside the Town who are expected to move into the Town to live in the ARCPUD.[3] There is no evidence that the Town has committed itself to expanding the Senior Center. There is no evidence as to the cost of constructing an addition to the Senior Center. There is no evidence as to the total number of persons who now utilize the Senior Center, the number who use the Senior Center and who reside in the previously approved ARCPUD, and the percentage increase likely to be attributable to Barberry’s ARCPUD.
When the issue of mitigation payments first was raised, Williamson did not respond. During the course of the next several meetings, the Board repeatedly suggested that Barberry make the requested contribution towards expansion of the senior center. Williamson continued to ignore the request.
Barberry asked the Board to approve a number of waivers. The Board’s regulations for ARCPUDs incorporate other Board regulations, including the Board’s Subdivision Regulations. The requested waivers changed from time to time as the plans were revised. Barberry requested waivers relating to the use of plastic drain pipe, the centerline width of five streets, roadway alignment, grading, pavement width and granite curbing.
Although the presence of affordable housing units in the ARCPUD does not lessen that development’s impact on the Senior Center, at some point, the Board reduced the amount being requested as a contribution to the Senior Center to $108,000 by eliminating the eight affordable housing units from the number of units multiplied by the $1,500 unit figure. Williamson objected to making any contribution toward expansion of the Senior Center.
At the March 13, 2007 meeting, Barberry provided the Board with selected expenses that it believed affected the profitability of the development, some of which related to the requested waivers. The delineated expenses included the $108,000 contribution to the Senior Center, its projected loss of $1,400,000 from the affordable housing requirement adopted after Barberry acquired the Property, $6,600 for scenic road cost, $101,082 for sloped granite curbing, and $25,000 to $40,000 for the sidewalk on Winthrop Street. Barberry’s acquisition price was over $3,000,000.
At the outset of the final meeting, Barberiy provided the Board with a letter discussing the impact of the Town’s zoning change following its acquisition of the Property but before the formal ARCPUD application was filed. Barberry stated that the selling price for an affordable unit is approximately $150,000, and it estimated its actual cost on a per-unit basis to be at least $325,000 per unit, so that its minimum loss for the eight affordable units was $1,400,000. Nothing required Barberiy to file the ARCPUD application. It was free to seek to develop the Properly in other ways after the affordable housing ARCPUD requirement was added to the Bylaw if it did not believe the project remained sufficiently commercially viable. Barberry’s letter requested the Board to grant certain “waivers/relief,” namely not to require either the donation to the Senior Center or the donation to the “Sidewalk Fund” and to allow a waiver of granite curbing within the project with the exception of cul de sacs, street radius, and catch basins.
In the end, all the waivers requested by Barberry were granted by the Board. Although the Board was not required to grant the requested waivers, it was reasonable for it to do so. Each of the waivers was considered on its own merit, with the Board weighing the cost to the developer of complying against the detriment, if any, to the Town should the waiver be granted. Granting the waivers resulted in no material harm to the Town.[4] No waiver was granted by the Board as an inducement to Barberry to agree to make a donation to the Senior Center. None of the waivers were granted as a part of a negotiated quid pro quo. The waivers, particularly the one permitting Cape Cod berm instead of granite curbing, resulted in cost savings to Barberry.
Williamson agreed that Barberry would reconstruct 1,000 feet of sidewalk in Lovering Heights in lieu of either constructing 1,234 linear feet of sidewalk and curbing on its Winthrop Street frontage or making a donation to the Town’s Sidewalk Fund in an amount calculated by Town Engineer to reflect the Town’s cost to construct such a sidewalk.
Once the Board indicated that it was likely to go along with the requested waiver of the granite curbing requirement, Andy Rodenhiser (“Rodenhiser”), chairman of the Board, turned to Williamson and, looking straight at him, asked “are you ok with the senior center payment?” This time, Williamson responded that he was “ok with it.” Williamson’s response was not consideration for the granite waiver or any other waiver. When making the inquiiy of Williamson, Rodenhiser did not purport to condition the Board’s granting the granite waiver or any other waiver upon *257 Barberry’s willingness to make the mitigation payment. Williamson, like the Board, did not link Barberry’s willingness to make a mitigation payment to the granite waiver or any other waiver. Rodenhiser also did not purport to condition the Board’s willingness to grant a special permit upon Barberry’s willingness to make the requested mitigation payment.
Shortly thereafter, at Williamson’s request, the Board closed the public hearing.
The Board’s planning consultant supplied a draft copy of the Board’s decision to Barberry. The draft decision stated that Barberry had agreed to contribute $108,000 to the Town to be used to support construction of an addition to the Town’s Senior Center. On May 25, 2007, Barberry asked the planning consultant to remove any suggestion in the decision to the effect that Barberry had agreed to the donation “because we simply do not agree with that requirement.” A revised draft decision then was circulated to the Board by the planning consultant, who alerted the Board to the fact that Barberry had requested that there be no mitigation payment and “that there not be a reference in the decision that the applicant ‘agrees’ to the payment since they do not agree.” The revised draft eliminated any reference to Barberry agreeing to a mitigation payment to support construction of an addition the Senior Center.
On May 29,2007, the Board issued its final decision (the “Decision”). It contains numerous findings. There is no finding that Barberry agreed to make a mitigation payment. The Decision contains no findings as to the impact of the ARCPUD on the Senior Center. There are no findings as to the Senior Center’s current utilization, anticipated increased utilization, or the cost of building an addition to the Senior Center. The Decision contains no findings to the effect that the eighiy-unit ARCPUD without a community center will not accommodate the long-term social, cultural, recreational and continuing care needs of senior residents and it contains no findings that the eighty-unit ARCPUD without a community center is not responsive to the socio-cultural, healthcare and recreational needs of senior residents. The Decision finds the ARCPUD to be consistent with all ARCPUD general standards and all applicable site development standards and also finds it is consistent with the goals and objectives of the Town of Medway Master Plan.
The Board voted 4 to 0 to grant an ARCPUD Special Permit to Barberry and to approve the ARCPUD plan submitted by Barberry “subject to the PLAN MODIFICATIONS, CONDITIONS, AND LIMITATIONS listed below and certain WAIVERS from the Subdivision Rules and Regulations.” The Decision has sections that follow, captioned “MODIFICATIONS,” “CONDITIONS,”[5] “LIMITATIONS,” and “WAIVERS.” None of these sections refer to any requirement that there be a mitigation payment. There is a sufficient basis to justify the Board’s decision to allow the special permit with the conditions, limitations, and waivers set forth in the Decision.
The only reference to mitigation occurs after the end of the waiver section. The Decision includes a paragraph captioned “MITIGATION,” which states, as follows:
As mitigation for creating 80 units of senior housing, the applicant will contribute $108,000 to the Town of Medway, pursuant to G.L.c. 44, section 53A or other acceptable mechanism, to be used to support construction of an addition to the Medway Senior Center. Of this amount, $54,000 shall be paid within sixty (60) days of the expiration of any appeal periods associated with the Special Permit decision. A second payment of $54,000 shall be made upon the Building Inspector’s issuance of the occupancy permit for the 41st dwelling unit within the development.
There is no evidence that the Board endorsed the requirement to contribute on the ARCPUD plan or set forth a separate instrument to be attached thereto, to which reference is made on the plan and which is deemed to be a part of the plan. The evidence does not justify the mitigation fee.
RULINGS OF LAW
This court reviews the Board’s decision on Barberry’s special permit application de novo. Bicknell Realty Co. v. Bd. of Appeal of Boston, 330 Mass. 676, 679 (1953). Upon the facts as so determined, the court shall “annul such decision if found to exceed the authority of such board ... or make such other decree as justice and equity may require.” G.L.c. 40A, §17. This language permits the court to affirm, annul, or remand a matter to a special permit granting authority. Roberts-Haverhill Associates v. City Council of Haverhill, 2 Mass.App.Ct. 715, 718 (1974).
The Board’s decision must not be based on a “standard, criterion, or consideration not permitted by the applicable statutes or bylaws.” Wells v. Zoning Bd. of Billerica, 68 Mass.App.Ct. 726, 731 (2007), quoting Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass.App.Ct. 68, 73 (2003). The court should not disturb the Board’s decision “unless it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary.” MacGibbon v. Bd. of Appeals of Duxbury, 356 Mass. 635, 639 (1970). “A decision is not arbitrary and capricious unless there is no ground which ‘reasonable [persons] might deem proper’ to support it." T.D.J. Dev. Corp. v. Conservation Comm’n of N. Andover, 36 Mass.App.Ct. 124, 128 (1994), quoting Cotter v. Chelsea, 329 Mass. 314, 318 (1952).
General Laws c. 40A, §9 requires the Board to make “a detailed record of its proceedings” and to “set[ ] forth clearly the reason for its decision." General Laws c. 40A, §9 also specifies that “[z]oning ordinances or by-laws shall provide for specific types of uses which *258 shall only be permitted in specified districts upon the issuance of a special permit.” These permits must be “for uses which are in harmony with the general purpose and intent of the ordinance or by-law, and shall be subject to general or specific provisions set forth therein.” Id.
Pursuant to its authority under chapter 40A, the Town adopted special permit bylaws, including the Bylaw governing ARCPUDs. Reflecting its broad authority over ARCPUD Special Permits, the Board’s Rules and Regulations specify that, when reviewing an application for a permit, it may “grant, grant with conditions, deny, or grant leave to withdraw an application . . .” Although authority to impose conditions on permits is broad, they must flow from authority within the Bylaw. Neither the Bylaw’s Specific nor General Standards expressly provide for conditioning a special permit on the satisfaction of seniors’ recreational needs. The Bylaw’s overall purpose, however, does include advancing “the long-term social, cultural, recreational and continuing care needs” of the Town’s senior citizens. Further, the Board’s Rules and Regulations state that the Board “may impose reasonable requirements to promote the health, convenience, safety and general welfare of the community and to benefit the Town.” Nothing in the Bylaw or the Zoning Act explicitly or implicitly authorizes the Board to require a developer to make a mitigation payment to a town to help finance the construction of an addition to a town building providing governmental services offsite to the general public.
Given the purpose of the Bylaw governing ARCPUD-s and the large measure of discretion afforded the Board, if the Board had concluded that Barberry’s application did not sufficiently provide for the social and recreational needs of seniors, it might have had the authority to deny the application altogether. See Pioneer Home Sponsors, Inc. v. Bd. of Appeals of Northampton, 1 Mass.App.Ct. 830, 831 (1973) (provided that a board is not basing its decision on a legally untenable ground and is not unreasonable, whimsical, capricious or arbitrary, “in the proper exercise of its discretion, [it] is free to deny a special permit even if the facts show that such a permit could be lawfully granted”). If the Board believed that the density of the proposed ARCPUD would adversely impact the Town’s ability to continue to provide the same level of services to the Senior Center’s existing client base, under the Bylaws’ General Standards, the Board might have had the authority to fix the density of the ARCPUD at a lower level than that requested by Barberry. Pursuant to the Board’s Rules and Regulations, it may also have had the ability to condition approval of the ARCPUD on inclusion of a community center in the development to meet the social and recreational needs of the ARCPUD’s residents. What the Board chose to do instead — require the applicant to make a payment to the Town to help defray the expansion of a Town facility that provides services to the general population — exceeded the Board’s authority.[6]
Indeed, the mitigation payment does not purport to be an authorized condition. It is not characterized in the Board’s decision as a “condition.” Rather, the requirement appears separately from all the conditions spelled out in the “Conditions” section of the decision. The mitigation requirement is found in an independent paragraph at the end of the decision denominated “Mitigation.” It requires Barberry to pay $108,000 to the Town pursuant to “G.L.c. 44, §53A or other acceptable mechanism”[7] to be used to support construction of an addition to the Town’s Senior Center. One-half of the payment is required to be paid within sixty days of the expiration of any appeals associated with the Board’s decision and the other half upon the Building Inspector’s issuance of the occupancy permit for the forty-first dwelling unit within the development. The Board did not, and could not, commit the Town to actually construct an addition to the Senior Center. Nothing in the mitigation provision would require the Town to return the funds should the Town’s Senior Center not, in fact, be expanded within a reasonable time frame.
Assuming that the Board does have the authority to impose, under certain circumstances, a mitigation payment, the enforced contribution at issue, designed to help pay for the construction of an expansion to a Town facility, is not legally tenable. See Emerson College v. Boston, 391 Mass. 415, 426-27 (1984) (finding fire protection charge to be an unlawful tax). The required mitigation payment is not a permissible fee.
[F]ees share common traits that distinguish them from taxes: they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner “not shared by other members of society”; they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge, and the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses.
Id. at 424-25 (citations omitted).
Turning to the first trait, the mitigation payment shares the characteristics of a tax, and not a fee, because it is intended to fund the expansion of the Town’s senior center, which provides services to all senior residents of the Town. The expanded Senior Center, if constructed, would not benefit the residents of the ARCPUD in a manner not shared by other senior members of the Town. All seniors in the Town would be allowed to use the new facility. An expanded Senior Center is a benefit shared by non-payers and so is “not particularized to the fee payers.” Greater Franklin Developers Ass’n, Inc. v. Franklin, 49 Mass.App.Ct. 500, 503 (2000) (holding “school impact fee” imposed by town on new residential developments for the pur *259 pose of covering the cost of expanding schools to be an impermissible tax, rather than a valid municipal fee). An expanded senior center, as with the expanded school capacity at issue in Greater Franklin Developers Ass’n, Inc., benefits the entire community. Under the first Emerson College factor, therefore, the mitigation payment required by the Board is better characterized as a tax because it does not benefit the fee payer in a manner not shared by others.
As for the second trait, Barberry does not have the option of preventing the residents of its development from utilizing the Senior Center and thereby avoiding the charge, but it can avoid the mitigation payment by choosing not to develop the ARCPUD. Nevertheless, “this factor is not conclusive.” Greater Franklin Developers Ass’n, Inc., 49 Mass.App.Ct. at 503.
Finally, the third trait, like the first, demonstrates the taxing nature of the mitigation payment required by the Board. Running a Senior Center is a service provided by the Town for its residents, which will continue to be provided whether or not the ARCPUD is constructed. The mitigation payment acts as a revenue-raising device to fund construction of an expanded Senior Center, rather than being a means to compensate the Town for providing a special service to seniors who reside at the ARCPUD. As with the overturned fire protection charge in Emerson College, the Board is attempting to take a service paid for from the general property tax and reclassify it as a special service with an incremental cost imposed. 391 Mass. at 418 n.5. Cf. Daniels v. Point Pleasant, 129 A.2d 265 (N.J. 1957) (striking down an ordinance raising the cost of building permits to cover increased school costs resulting from growth), cited with support in Greater Franklin Developers Ass’n, Inc., 49 Mass.App.Ct. at 504.
Accordingly, the Board’s decision requiring Barberry to make a mitigation payment to the Town cannot stand because it is a legally untenable tax.[8]
Even if the Board had authority to impose a mitigation fee for the purpose of helping the Town to finance an expansion of its Senior Center, the payment required by the Board cannot stand because it is unreasonable, whimsical, capricious and arbitrary. The Board made no individualized determination as to the nexus between the proposed ARCPUD and the impact on the Senior Center to be mitigated, and it made no findings relating the amount of the $108,000 mitigation payment to the impact likely to be caused by the ARCPUD on the Senior Center. There were no findings, for example, as to the number of people in the ARCPUD likely to use the Senior Center who would not already have been residents of the Town and no estimate as to how much of the projected total utilization of the Senior Center is likely to be attributable to residents of the ARCPUD. There also were no findings as to the estimated cost of constructing an expansion of the Senior Center. The amount the Board required Barberry to pay in mitigation bears no relationship whatsoever to any identified impact. The Board’s fee-per-unit calculation was based on nothing beyond what a prior developer had voluntarily offered to contribute to the Town in the give and take of that developer’s permitting process. There is no ground which reasonable persons might deem proper to support the mitigation payment required by the Board.
The Board contends that, in any event, it had the right to require Barberry to make the mitigation payment because Barberry agreed to make the payment. There was, however, no bargained-for exchange of promises. The Board did not expressly condition its amenability to grant the requested waivers on Barberry’s promise to make a mitigation payment to the Town, and Barberry did not expressly condition its willingness to make the mitigation payment on the Board’s granting the requested waivers. Accordingly, the parties did not have an enforceable agreement. Barberry was free to revoke its promise, which it subsequently did, before action was taken in reasonable reliance upon it.
Without mentioning the word “estoppel," the Board maintains that Barberry lost its right to withdraw its offer to make the mitigation payment because the Board had “the right to rely" on that representation. A “right to rely” is not, however, the same as reasonable reliance. Barberry communicated its unwillingness to agree to any voluntary payment before the Board voted to grant any of the waivers requested by Barberry and before the Board agreed to grant the special permit with conditions. A right to rely upon a promise to make a gift dissipates when that promise is withdrawn before the gift is made. The facts presented here are radically different from those with which the Court was presented in Murphy v. Planning Bd. of Hopkinton, 70 Mass.App.Ct. 385 (2007), upon which the Board relies. In Murphy, the owner of undeveloped land, which was subject to access restriction as a result of a town planning board’s conditional endorsement of an ANR [approval not required] plan, brought an action against the planning board seeking a declaration that the board had no authority to endorse an ANR plan conditionally and that the restrictions were unenforceable. The restrictions on the parcel came into being fifteen years before the plaintiff bought the parcel. Id. at 385. In holding that the plan and conditions placed upon it were so inextricably bound up together that they could not be unbundled, the Court reasoned:
[The predecessor in interest], with a special permit in hand allowing the parcel a means of access to a different street, instead apparently chose the path of compromise; conditions were added to the face of the ANR plan, which the board endorsed, the parties memorialized the restriction in a contemporaneously executed agreement, and both docu *260 ments were recorded at the same time the following day. The conditions that [the current owner] now challenges, about which he had notice when he bought the parcel, cannot be unbundled at this late date from the approval of the ANR plan that [the current owner] wishes to preserve: both inextricably are bound up together in the §8 IP endorsement process from which no timely appeal was taken . . . It is too late in the day to revisit whether the board acted lawfully in imposing the conditions as part of the §8IP process.
Id. at 390-91. By contrast, it is not too late for Barberry to challenge the lawfulness of the Board’s imposing a mitigation fee to fund construction of a town building as part of the special permitting process.
Finally, Medway claims that, even if Barberiy had the right to rescind its offer to make the mitigation payment, it lost that right after the closure of the public hearing period. However, the Board itself invited a response from Barberry when it sent it a copy of its draft decision following the public hearing. Barberry availed itself of the opportunity afforded to it by the Board’s disclosure of its draft to make it clear to the Board that, whatever its designated representative may have indicated, it was not amenable to making any voluntary payment. The Board then not to adopt the draft sent to Barberiy; it approved a decision that lacked any reference to Barberry having agreed to the mitigation payment. Lovaco, Inc. v. Zoning Bd. of Appeals of Attleboro, 23 Mass.App.Ct. 239, 241 (1986), does not require a different result. In that case the Board received no evidence in its open, public hearing that furnished a basis for the amount of the bond it required as a condition and there had been no opportunity for the applicant to rebut the estimate the board received after the hearing. In this case, there was nothing to rebut.
When the Board made its decision, it was under the mistaken impression that it could require Barberiy to contribute $108,0000 to the Town to fund construction of an expansion to the Town’s Senior Center. Under the circumstances, rather than simply striking the mitigation requirement and leaving the rest of the decision in place, the court concludes that it appropriate to vacate the decision and remand the matter to the Board.
ORDER
For the reasons stated, it is ORDERED that the decision of the Medway Planning Board be and hereby is VACATED and the matter is REMANDED for further proceedings before the Board.

The revised plans also provided a new access scheme for the site, more green areas, a courtyard, different road and driveway configurations, and a new circulation pattern.

The Board’s decision finds that the ARCPUD is expected “to help accommodate the Town’s growing active adult/senior citizen population by providing alternative housing opportunities other than the conventional single family detached home. ” An existing resident moving from one part of the Town to another part of the Town would not be expected to add any strain to the Senior Center.

The sidewalk, for example, would not connect with anything then in existence if constructed on the project’s frontage. The width reduction requested by Barberry actually advanced the Board’s goal to reduce the amount of paving. Although granite is more durable and is not susceptible to deterioration by salt, the roads in the development were not expected to be Town roads, although the possibility does exist that taxpayers (other than unitholders) might, at some point in the future, petition the Town to accept the roads.

Failure to adhere to any of the conditions stated in the Decision is cause for the Board to hold a public hearing to determine whether the Special Permit should be revoked or whether the violation warrants any other action.

The required mitigation payment differs significantly from a requirement that a performance bond be posted. Accordingly, Lovaco, Inc. v. Zoning Bd. of Appeals of Attleboro, 23 Mass.App.Ct. 239, 243 (1986), is not persuasive authority for the proposition that the Board had the right to require the mitigation payment.

G.L.c. 44, §53A permits a town to accept grants or gifts of funds from a private corporation and permits the town to expend such funds for the purposes of such grant or gift with the approval of the city manager and city council, mayor and city council, or board of selectmen depending upon the manner in which such town is governed. The statute further provides that any amounts so received shall be held as a separate account and may be expended, once approval has been obtained, without further appropriation.

Barberry has not argued that the mitigation payment the Board required it to make is legally untenable as an unconstitutional monetary exaction. Thus, this court does not reach whether the mitigation payment required by the Board must meet the tests set forth in Nollan v. California Coasted Comm'n, 483 U.S. 825, 837 (1987) (holding that the Fifth Amendment to the United States Constitution prevents a governmental body from conditioning the approval of a building permit on requirements imposed on the landowner unless there is a “nexus” between the requirements imposed and the interests that the governmental body would be properly protecting in denying the permit outright), and Dolan v. Tigard, 512 U.S. 374, 391 (1994) (requiring “rough proportionality” between requirements imposed and interests protected), and, if so, whether the mitigation fee would pass constitutional muster. In Durand v. IDC Bellingham LLC, 440 Mass. 45, 54 n. 18 (2003), a case in which there also was no Fifth Amendment claim, the Court noted that Nollan “has also been held to apply to government extraction of money as much as to the imposition of restrictions on the use of real property.” The Court cited, as support, Ehrlich v. Culver City, 12 Cal.4th 854, 859, 911 P.2d 429, cert. denied, 519 U.S. 929 (1996) (Nollan and Dolan apply to a “monetary exaction” imposed as a condition of approving a request that real property be rezoned to permit the construction of a multi-unit condominium [emphasis in original]). See also Home Builders Ass'n of Dayton & the Miami Valley v. Beavercreek, 729 N.E.2d 349, 356 (Ohio 2000) (applying Nollanto evaluate the constitutionality of an impact fee ordinance when a Takings Clause challenge is raised). Accord Eastern Enterprises v. Apfel, 524 U.S. 498, 523-530 (1998) (Fifth Amendment applies to government-required payments into benefits fund).